655 A.2d 138

**Stephen M. TAKES, and Catherine
C. Takes, his wife, Appellees,**

**v.**

**METROPOLITAN EDISON COMPANY,
a Corporation, Appellant,**

**v.**

**Stephen M. TAKES, d/b/a El Greco Painting Company.**

**Stephen M. Takes, and Catherine C. Takes, his wife, Appellants,**

**v.**

**METROPOLITAN EDISON COMPANY,
a Corporation, Appellee,**

**v.**

**Stephen M. TAKES, d/b/a El Greco Painting Company.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1994.

Filed Feb. 22, 1995.

102

104

Richard T. Wentley, Pittsburgh, for Metropolitan Edison Co.

Ronald W. Shipman, Easton & George C. Diamantopulos, Pittsburgh, for Stephen and Catherine Takes.

Before ROWLEY, P.J., and CAVANAUGH, WIEAND, McEWEN, CIRILLO, OLSZEWSKI, BECK, KELLY and POPOVICH, JJ.

CAVANAUGH, Judge:

In this case the appellees, Takes, were awarded verdicts for compensatory damages totaling $1,460,414, including $500,000 for pain and suffering for Mr. Takes and $150,000 loss of consortium damages for Mrs. Takes. An award of $3,000,000 was made for punitive damages.[1] A core issue in the post-trial motions and on appeal in this court is the propriety of the court's charge and a special interrogatory given to the jury as they relate to the definition of punitive damages—that is, whether the court improperly allowed the jury to consider negligence standards in their determination of entitlement to punitive damages. The trial court (which denied all post-verdict motions by appellant, Metropolitan Edison) determined that the appellant had preserved the punitive damages issue for its post-trial review, but found that there was no error in the charge or jury interrogatory.

Before considering the issues on appeal, we must determine whether the punitive damage definition issue has been pre-

1. The award for delay damages brings the total to $4,975,730.35.

served for our consideration. The decision in *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974) was inspired, at least in part, by an effort to motivate trial counsel to be diligent to assist the court in preventing error at the trial stage where it could be corrected. In that pivotal case, the supreme court eliminated the usage of the "basic and fundamental error" doctrine as a means of achieving appellate court review of trial error. The court made no decision as to the specificity necessary to preserve an objection to trial court error and offered no suggestion that the finding on the issue preservation should be influenced in a given case by concerns of judicial economy.

Since we will conclude that the trial court committed error in that it improperly permitted the jury to consider negligence concepts in the determination of the right to punitive damages, we examine the present record to see if the appellant has waived any appellate review of this issue. On the morning of February 26, the court met in chambers with counsel to discuss the charge and verdict sheet. There was an extended discussion with respect to punitive damages. Appellant's attorney argued strenuously against *any* punitive damages charge and, in the alternative, argued that, if given at all, it should be restricted to a situation wherein appellant was urged to do his work under known dangerous circumstances, and in support thereof, at the conclusion of an extended three-page argument, concluded thusly:

> Therefore, Judge, taking that position, since I think the only scenario that makes it is they should be charging this way—and let me finish just this part—if you allow the jury to wander around in the fact combination with this blanket charge: do you find they acted in a *negligent,* willful and reckless manner is prejudicial to the defense in this instance—because it *suggests that the Court thinks any combination of the facts that they would choose could infer wanton and reckless negligence from the those* [sic] *facts* and that's just not the case.
>
> [emphasis added]

Thus, it is clear that counsel verbalized an objection to a charge which would permit elucidation of negligence concepts in the punitive damages charge.

Later, as the court was attempting to move through exhibit evidence and a final collation of jury interrogatories, counsel stated:

MR. TAYLOR: Your Honor, I suppose my objection to the Court's decision to give the question of punitive damages is saved by my objection at this point for all the reasons that I have advanced.

During the course of the charge:

THE COURT: I will do that.

MR. TAYLOR: My only objection, your Honor, is I don't think that you have defined exactly the extent that you've got to go to show reckless. [sic]

And then, during and at the conclusion of the charge which included this language:

A person's conduct is outrageous, and included among that would be reckless, *negligent*, willful and wanton, when that person acts with a bad motive or when he acts with reckless indifference to the interests of others. That is the definition with which we approach that issue.

(emphasis added)

(In response to request for additions to charge at conclusion):

MR. TAYLOR: Your Honor, I restate the Defendant's objection to the Court's charging on reckless and intentional and punitive damages.

In order to appreciate the danger inherent in any attempt to undertake an independent and subjective reconstruction of the record in order to discover the critical thought processes of the trial court and trial counsel, we must first examine a crucial excerpt from the trial court opinion. The court stated:

\* \* \* \* \* \*

To fully appraise the breadth of defendant's objection as preserved, the following record must also be addressed:

MR. TAYLOR: What happens to my proposition that the application of the reckless is limited to a fact situation? (That recklessness could be found only if Met Ed personnel knew the capacitor was energized and deliberately said it was not.)

THE COURT: I'm thinking. I'm not going to get into that any more than I want the subparts and the negligence question (Restatement § 500 discussion) of Met Ed. And if they find it I think—if I put it (punitives) in there and it's held, it's (recklessness) going to be held on the basis of the four corners of the case, not on a particular factual issue. And if the court finds that the scenario which is defined by the evidence at its worst is that Met–Ed does not support recklessness, then the punatives (sic) get struck. If the entire four corners of the evidence say yes, that it does sustain punitives (sic), then you're stuck.

MR. TAYLOR: I have a point for charge that frames the issue that satisfies that (deliberate misrepresentation of energized state as) the only basis on which can find, and that will protect it, but I would take exception.

THE COURT: All right. Defendant says that not only does the Defendant object to the submission under these facts of the issue of recklessness to the jury, but more so that, if it were to be submitted, it could be submitted only on the limited basis that is defined in the Northampton County case; namely, that there had to be a positive instruction by Met–Ed employees that the capacitor was de-energized at the time that this Plaintiff was painting it, when, in fact, it was energized. Am I correct?

MR. TAYLOR: Yes, Judge.

THE COURT: And if I submit the reckless question, I am not going to use that, and your exceptions [sic] noted. I would submit it in the standard general form. (N.T. February 26, 1992, pp. 661–663).

Thus it is clear Met Ed's primary objection expressed at trial and intended to be preserved revolved around Met Ed's contention that punitive damages would not lie absent a finding by the jury that Met Ed's agent knowingly told

the plaintiff that the capacitor was de-energized when he knew it was not. The court rejected that contention. (N.T. Feb. 26, 1992, pp. 661–662). Having determined that Met Ed preserved its objections to the jury charge on punitive damages, as well as to the jury interrogatory concerning punitive damages, we now address the substantive issues raised by Met Ed.

\* \* \* \* \* \*

Accordingly, we have the trial court's *own conclusion* from the record before it.

■ Although the exact meaning of the exchange between Mr. Taylor and the court is somewhat obscure, it is clear that the trial court recalled this as a broad preservation by counsel of objections to errors and shortcomings in the charge and jury interrogatory on punitive damages.[2] It would be an inappropriate function of a reviewing court to substitute its own subjective interpretation of the record in order to find waiver when it was "clear" to the trial court that the objection as to punitive damages was "preserved".

■ Similarly, when the record itself is sufficient to demonstrate preservation of an issue (as is the present situation), it would be inappropriate for us as a reviewing court to speculate as to the subjective thought processes of counsel. The wisdom of the *Dilliplaine* rule is that it is a rule of fairness which discourages gamesmanship as a trial tactic. A party may not remain silent and take his chances on a verdict and then complain that it is adverse. *Carter by Carter v. United States Steel Corp.*, 529 Pa. 409, 604 A.2d 1010 (1992), reargument denied, certiorari denied, 113 S.Ct. 186. In enforcing this policy, we have not required unnecessary precision of language in order to fairly find preservation. *Caldwell v. City of Philadelphia*, 358 Pa.Super. 406, 517 A.2d 1296 (1986), appeal denied, 517 Pa. 597, 535 A.2d 1056 (1987) (no waiver by

---

2. We have examined the original record and find that, in quoting the excerpt from the record in his opinion reproduced above, the court engaged in a degree of paraphrasing from the exact terminology to be found in the original record.

reason of failure to use term "special relationship" in charge request); *Eck v. Powermatic Houdaille,* 364 Pa.Super. 178, 527 A.2d 1012 (1987) (challenge to charge, preserved by, *inter alia,* mention of issue during inchambers conference); *Morganstein v. House,* 377 Pa.Super. 512, 547 A.2d 1180 (1988), appeal dismissed, 525 Pa. 498, 581 A.2d 1377 (1990) (challenge to substantive portion of jury charge preserved by objection that "it was confusing"); *Brancato v. Kroger Co., Inc.,* 312 Pa.Super. 448, 458 A.2d 1377 (1983) (finding no waiver by reason of lack of specific exception to error in charge.)

■ An examination of authorities on the issue of waiver in Pennsylvania and a fair and objective review of the present record lead inescapably to the conclusion that the trial court rightly concluded that appellant had not waived any objection to the content of the jury instruction concerning the incorporation of negligence concepts as a basis for the award of punitive damages. An added reason is that a certain deference should be paid to the trial court's determination on the issue of waiver since it is the trial court, and none other, who is in a position to judge the extent to which counsel was encouraged or discouraged from making highly detailed objections on the record during the course of time-pressured and highly technical discussions concerning the proposed charge in a major case. It is also the trial court which can best determine when an objection, somewhat general with terms, is mutually understood to encompass more specific objections which might be made as part thereof.

■ We conclude that the record in this case objectively demonstrates that the punitive damages definition issue was preserved by objections at trial, by inclusion in post-verdict motions, and by assertion in the present appeal.

One additional postulate merits discussion. In support of his waiver, appellant has cited *James v. Nolan,* 418 Pa.Super. 425, 614 A.2d 709 (1992) and *Smith v. Brooks,* 394 Pa.Super. 327, 575 A.2d 926 (1990), appeal denied, 527 Pa. 621, 592 A.2d 42 (1991) for the proposition that an appellate court may overlook a possibly valid claim of trial waiver when the trial

court on post-trial motions chooses to address the issue. The counter-argument is that deference shown in *Nolan* and *Brooks* is not appropriate here since in those cases, the excused waiver resulted in consideration of an issue which did not necessitate reversal, thus defining *Dilliplaine* in this area as a rule of judicial expediency. As set forth above, we conclude that there *was* effective preservation of the punitive damages error at trial and, therefore, it is unnecessary to find excused waiver as in *Nolan* and *Brooks*. Moreover, our courts have frequently countenanced rejection of a waiver argument where the result is reversal or the award of a new trial. *Loos and Dilworth v. Quaker State Oil Refining Corp.,* 347 Pa.Super. 477, 500 A.2d 1155 (1985); *See also, Eck v. Powermatic Houdaille,* 364 Pa.Super. 178, 527 A.2d 1012 (1987) (waiver argument rejected—new trial granted) *Caldwell v. City of Philadelphia,* 358 Pa.Super. 406, 517 A.2d 1296 (1986), appeal denied, 517 Pa. 597, 535 A.2d 1056 (1987) (trial court reversed); *Bozzo v. Electric Weld Division,* 283 Pa.Super. 35, 423 A.2d 702 (1980), affirmed, 495 Pa. 617, 435 A.2d 176 (1981) (waiver argument rejected—reversed and new trial awarded); *Morganstein v. House,* 377 Pa.Super. 512, 547 A.2d 1180 (1988), appeal dismissed 525 Pa. 498, 581 A.2d 1377 (1990) (waiver rejected and new trial granted); *Cagnoli v. Bonnell,* 531 Pa. 199, 611 A.2d 1194 (1992) (waiver rejected—judgment on pleadings reversed—remand for trial); *Blum v. Merrell Dow Pharmaceuticals,* 385 Pa.Super. 151, 560 A.2d 212 (1989), affirmed, 534 Pa. 97, 626 A.2d 537 (1993) (waiver argument rejected—reversed—new trial granted); *Boscia v. Massaro,* 365 Pa.Super. 271, 529 A.2d 504 (1987), appeal denied, 517 Pa. 620, 538 A.2d 874 (1988) (no waiver found—new trial award affirmed). *See also, Hall v. Acme Markets,* 110 Pa.Cmwlth. 199, 532 A.2d 894 (1987) *Summit Fasteners v. Harleysville National,* 410 Pa.Super. 56, 599 A.2d 203 (1991).

We conclude that the issue of the propriety of the punitive damage charge has been duly preserved for our consideration. We proceed to the merits.

\* \* \* \* \* \*

Appellant/defendant Metropolitan Edison is a utility which supplies electricity to eastern Pennsylvania. In the fall of 1987, Metropolitan Edison decided to have several of its electrical substations painted. Appellee/plaintiff Stephen Takes had thirty years' experience as an industrial painter, including experience painting electrical power stations in western Pennsylvania. Mr. Takes, through his company El Greco Painting, submitted the lowest bid for painting a number of de-energized Metropolitan Edison substations in the Easton area. The one substation which Metropolitan Edison could not de-energize was awarded to a different contractor; Mr. Takes only bid on painting de-energized equipment.

Metropolitan Edison awarded Mr. Takes the contract on the de-energized substations, and painting began in October of 1987. Mr. Takes and his crew had completed five of the substations when they started work on the Dock Street substation in Easton. Unbeknownst to Mr. Takes, the substation had been de-energized except for a 4,800–volt capacitor. The parties disagreed as to whether Mr. Takes was warned about the live capacitor, but the structure was not roped off, nor were any warning signs posted. Mr. Takes had climbed the capacitor's structural housing and was painting it when an enormous electric shock knocked him off of his perch. He fell ten feet, hitting the ground head first. Fortunately, he was wearing his hardhat.

Mr. Takes suffered serious injuries from the electric shock and fall. The current destroyed the middle finger of his left hand, which had to be amputated; it also left black, leathery entrance and exit wounds on both sides of his body. The fall broke two of his ribs and fractured his scapula. Mr. Takes sustained other injuries as well, and now suffers from severe depression and Post–Traumatic Stress Syndrome.

We first address an evidentiary ruling which Metropolitan Edison challenges.

I.

Metropolitan Edison tried to establish comparative negligence by showing that the capacitor was humming and vibrat-

ing, so Mr. Takes should have known it was energized and not have climbed its housing. The jury was taken to view the Dock Street substation, but in its fully energized state, rather than with all the equipment de-energized except for the one capacitor. Dr. Eugene Bartel, an electrical engineer and the Takes' expert, testified that the capacitor was quiet. Metropolitan Edison rebutted his testimony with that of its company foreman, Lovene Heller, who described how the capacitor naturally hummed and vibrated when energized.

Metropolitan Edison wished to bolster this claim with more expert testimony. Metropolitan Edison asked its expert, Dr. Terence Hockenberry, whether he had observed the Dock Street capacitor humming and vibrating. The trial court sustained plaintiffs' objection, ruling that Dr. Hockenberry's answer would have been both cumulative and beyond the scope of his report.

Evidentiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law. *Movie Distributors Liquidating Trust v. Reliance Ins. Co.*, 407 Pa.Super. 588, 595 A.2d 1302 (1991), *alloc. denied,* 529 Pa. 658, 604 A.2d 249 (1992). The expert report focused on Mr. Takes' adherence to the pre-determined work plan, and what steps he could have taken to avoid electrocution. Despite its high degree of detail, the report made no mention of capacitor rattle and hum. The trial court ruled from the bench that the proposed expert testimony would have gone beyond the report's fair scope. N.T. 2/24/92 at 449–453; trial court opinion 2/26/93 at 19–20. In considering Metropolitan Edison's post-trial motions, the trial court also held that the proposed expert testimony would have only duplicated Mr. Heller's similar testimony.

Metropolitan Edison argues that Dr. Hockenberry's testimony would not have been cumulative, because his credentials are stronger than Mr. Heller's. We are inclined to agree. Without Dr. Hockenberry's testimony, Metropolitan Edison had to rebut the Takes' expert with testimony of their own power station foreman. While we would not disparage Mr.

Heller's expertise and personal knowledge of the Dock Street capacitor, we must acknowledge that a jury might give more weight to an expert with a Ph.D. in electrical engineering. Thus, Dr. Hockenberry's testimony would not have merely duplicated Mr. Heller's; its greater weight made it different.

■ We do agree with the trial court, however, that the testimony would have gone beyond the fair scope of Dr. Hockenberry's expert report. The report was produced in response to the Takes' discovery interrogatories, which asked: 1) who Metropolitan Edison intended to use as an expert; 2) his qualifications; and 3) a "description of the test or experiment relative to which he will testify." Plaintiff's interrogatories nos. 45 and 46.

Metropolitan Edison acknowledges that rule 4003.5(c) limited Dr. Hockenberry's live testimony to the fair scope of his expert report. *See* Pa.R.C.P. 4003.5(c), 42 Pa.C.S.A. This same rule states that an expert "shall not be prevented from testifying as to facts or opinions on matters on which he has not been interrogated in the discovery proceedings." *Id.* Explanatory note six advises parties to make broad discovery inquiries in order to force all of the expert's proposed testimony into the report, and prevent surprise at trial. Metropolitan Edison argues that the Takes' interrogatories were too narrow, so Dr. Hockenberry should have been permitted to testify regarding other relevant issues not mentioned in his report, such as the capacitor's noise and vibrations.

While the Takes' interrogatories did not parrot the language of rule 4003.5(a)(1), we think that they were broad enough.

At trial Dr. Hockenberry was asked,

Q. Now, Doctor, did you also at my request today—and I think previously—did you go to the substation and did you may note of what noise or what vibrations that that capacitor made when it was energized?

A. Yes.

Q. Now, we're talking about the capacitor shown in the pictures and the capacitor upon which Mr. Takes was injured.

[Plaintiff's counsel]: I'm going to object to this, your Honor. It's outside the fair scope of the report.

N.T. 3/24/92 at 449–450. At this point, the court held a sidebar conference and sustained the objection.

.The question put to Dr. Hockenberry was whether he observed if the energized capacitor made noise or vibrated. The act of observing a disputed phenomenon and noting the results is a test or experiment, albeit a simple one. It therefore fell within the ambit of the Takes' interrogatories, and Dr. Hockenberry was bound to mention it in his report if he wanted to be able to testify about it at trial. Since the report made no mention of capacitor rattle and hum, the proposed testimony would have gone beyond its fair scope and the objection was properly sustained.

## II.

■■■ We now turn to the issues involving the punitive damage award. Metropolitan Edison argues that the trial court erred in: 1) allowing the issue of punitive damages to go to the jury; 2) not restricting the application of punitive damages to a particular fact situation; and 3) instructing the jury that punitive damages could be imposed for negligent or grossly negligent conduct, when nothing less than outrageous conduct (*i.e.*, conduct evidencing reckless indifference) will do.[3] The Takes respond that the alleged errors were either decided correctly or waived.

## A.

■■■ Metropolitan Edison argues that the issue of punitive damages should never have gone to the jury. It is well

---

**3.** Metropolitan Edison also contends that the punitive damage award was excessive, and denied the utility due process of law. Metropolitan Edison does not develop or support these contentions at all. We will therefore note that the punitive damage award, while large, was only about twice the amount of the compensatory damage award—hardly an unreasonable relationship. *Cf. Kirkbride v. Lisbon Contractors*, 521 Pa. 97, 102–104, 555 A.2d 800, 803–804 (1989) (punitive damages need not bear any relationship to compensatory damages, but may be reduced where they shock the court's conscience). Since Metropolitan Edison has not offered any basis for a remittitur of the punitive damage award, we will not arbitrarily eliminate or reduce it.

settled that punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the rights of others. *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984); Restatement (Second) of Torts, § 908(2). Neither mere negligence, nor even gross negligence, shows sufficient culpability to justify a punitive damage award. *SHV Coal v. Continental Grain Co.*, 526 Pa. 489, 587 A.2d 702 (1991); *Smith v. Celotex Corp.*, 387 Pa.Super. 340, 564 A.2d 209 (1989). Rather, "[p]unitive damages are proper when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct." *SHV Coal, supra* at 493, 587 A.2d at 704.

We agree with the trial court's decision to submit the issue of punitive damages to the jury. Given the extreme danger inherent in the generation and transmission of high voltage electric current, Metropolitan Edison owed Mr. Takes the highest duty of care our law imposes. *Meehan v. Philadelphia Electric Co.*, 424 Pa. 51, 53–55, 225 A.2d 900, 902 (1967). Metropolitan Edison does not contend that it was unaware of the capacitor's energized state when Mr. Takes and his crew began painting the substation. *Cf. Field v. Philadelphia Electric Company*, 388 Pa.Super. 400, 425–426, 565 A.2d 1170, 1182 (1989) ("If the defendant actually does not realize the high degree of risk involved, even though a reasonable man in his position would, the mental state required for the imposition of punitive damages under Pennsylvania law is not present."). Rather, Metropolitan Edison was indifferent to a known risk of enormous magnitude. Such conduct shows a higher degree of culpability than subjective ignorance, and can support a punitive damages award. *See SHV Coal, supra* at 493–495, 587 A.2d at 704 (citing Restatement (Second) of Torts, § 500, comment a).

### B.

In the alternative, Metropolitan Edison sought a jury instruction that punitive damages would only be proper if its employees knew that the capacitor was energized, but told Mr.

Takes it was de-energized and safe to paint. N.T. 2/26/92 at 654–657. If the jury believed Mr. Takes' trial testimony to this effect, it would support the imposition of punitive damages. Metropolitan Edison sought to prove that Mr. Takes ignored its warnings about the capacitor, so even if the jury found the utility negligent it would have no basis for awarding punitive damages. If the jury had to believe one or the other version of events, then Metropolitan Edison's request for a fact-specific instruction would make sense.

Metropolitan Edison's theory is flawed, though, because it presumes that the jury had to choose one story or the other, when the evidence presented could have supported other fact situations which outrage. Here, the jury might have given less credence to both Mr. Takes' and the utility's oral testimony, and chosen to rely more on the extensive documentary evidence. This evidence established that through the contracting process and from the work specifications, Mr. Takes was led to believe that the entire substation would be de-energized for painting. In less hazardous circumstances a failure to warn might establish no more than mere negligence. With a live, 5–kilovolt capacitor on the premises, a jury could certainly find the sort of reckless indifference which calls for a punitive damage award. Hence, we agree with the trial court that the punitive damage instructions need not have been framed by Metropolitan Edison's intentional misrepresentation theory, since other, reasonable views of the evidence could support a punitive damage award.

## C.

Metropolitan Edison finally argues that the trial court misstated the law on punitive damages in its jury charge and in the verdict interrogatories. We agree that the court erred in introducing negligence concepts into the punitive damage issue.

Verdict interrogatory number nine dealt with punitive damages. During the court's instruction on the general principles of punitive damages, the following exchanges took place:

[The Court, charging the jury]: ... The amount of punitive damages awarded must not be the result of passion or prejudice against Metropolitan Edison on the part of the jury. The sole purpose of punitive damages and the only purpose for which you may make such an award, if you were to make such an award and set an amount of punitive damages, is to punish Metropolitan Edison's **outrageous** conduct, if you were to find it as such, and to deter Metropolitan Edison and others from commission of like acts.

Question number nine asks that very question: Do you find that Metropolitan Edison acted in a **grossly negligent,** reckless, willful or wanton manner in causing injuries to Mr. Takes, and if you do, what damages do you find?

Gentlemen, are there any suggested corrections to the punitive damages, additions or corrections to the punitive damages instruction?

AT SIDE BAR:

[Defense counsel]: Just to that page, your Honor?

THE COURT: Yes, just to that page.

[Plaintiffs' counsel]: Your Honor, I would like you to request the court to charge the standard jury instruction on punitive damages, 1400.

THE COURT: I will do that.

[Defense counsel]: My only objection, your Honor, is I don't think that you have defined exactly the extent that you've got to go to show reckless.

THE COURT: A person's conduct is outrageous when he acts with a bad motive, or when he acts with a reckless indifference, and I'm about to charge that.

[Defense counsel]: Fine, Judge.

IN OPEN COURT:

[The Court, continuing to charge the jury]: ... A person's conduct is **outrageous,** and included among that would be reckless, **negligent,** willful or wanton, when that person acts with a bad motive or when he acts with reckless indifference

to the interests of others. That is the definition with which we approach the issue.

*Id.* at 832–834 (emphasis added).

The jury later returned with its verdict for the Takes. The verdict slip read:

*QUESTION 9:*

Do you find that Metropolitan Edison acted in a **grossly negligent,** reckless, willful or wanton manner in causing injuries to Mr. Takes?

Yes __X__

No ___

If you answer *"Yes"* proceed to Question No. 10. Otherwise, return to the courtroom.

*QUESTION 10:* (Answer only if you answered "Yes" to Question No. 9)

State the amount of punitive damages you award for plaintiff against defendant:

| | |
|---|---|
| Steve Takes | $3,000,000.00 |
| Catherine Takes | $ 00.00 |

R. 44, Verdict Slip (emphasis added). The verdict was read in open court.

[Court clerk]: Question number nine: Do you find that Metropolitan Edison acted in a **grossly negligent,** reckless, willful or wanton manner in causing injuries to Mr. Takes?

[The jury foreperson]: Yes, we do.

[Court clerk]: Question ten: State the amount of punitive damages you award for Plaintiff against Defendant?

[Jury foreperson]: Three million dollars.

We have rejected argument that any mistake was waived by Metropolitan Edison's failure to object at trial. In the alternative, the Takes argue that the charge and interrogatories were a correct statement of the law.

 The trial court's charge and verdict interrogatories did not correctly state Pennsylvania law, though.[4] Our high court has specifically held that punitive damages may not be awarded for negligent, or even grossly negligent conduct. *SHV Coal, supra* at 495, 587 A.2d at 705; *see also Smith, supra* at 345, 564 A.2d at 211. We have defined outrageousness as "willful, wanton or reckless conduct." *SHV Coal, supra* at 493, 587, A.2d at 704. Verdict interrogatory number nine would have been a fair statement of the law if it had asked "Do you find that Metropolitan Edison acted in a reckless, willful or wanton manner in causing injuries to Mr. Takes?" The trial court misinstructed the jury by conjunctively adding the qualifier "grossly negligent" to describe the manner of conduct which could support punitive damages.

 Likewise, the trial court almost quoted the standard jury instruction in defining outrageousness at defense counsel's request. This instruction uses the definition from the Restatement of Torts: "A person's conduct is outrageous when he acts with a bad motive or when he acts with reckless indifference to the interests of others." Restatement (Second) of Torts § 908(2), quoted in Pennsylvania Suggested Standard Civil Jury Instruction 14.00 (Pennsylvania Bar Institute, 1984). The trial court chose to expand upon the definition by adding some adjectives to describe outrageousness. The terms "reckless," "willful" and "wanton" all correctly apply, but not the term "negligent."[5] Thus, by telling the jury that a "person's

**4.** Whether the jury was accurately instructed is a question of law, which we review *de novo*. *Morrison v. Dept. of Public Welfare*, 538 Pa. 122, 132, 646 A.2d 565, 570–571 n. 8 (1994).

**5.** The comments to the suggested instruction note that older versions used a string of adjectives to define outrageous conduct: "malicious, wanton, reckless, willful, or oppressive." These multiple qualifiers, while correct, were likely to confuse juries. The Subcommittee on Civil Jury Instructions therefore adopted the Restatement's more concise language.

We do not mean to suggest that judges should never go beyond quoting the suggested standard instructions for fear of making a mistake which could taint the verdict. Recent research indicates that pattern instructions can be incomprehensible to the lay juror, and judges should make an effort to explain the law in plain English. *See* Shari s. Diamond, *Instructions Frequently Baffle Jurors; Although the Vast Majority of Jurors Say They Follow What the Court Tells Them, Studies Show*

conduct is outrageous, and included among that would be reckless, negligent, willful or wanton, when that person acts with a bad motive or when he acts with reckless indifference to the interests of others," the trial court again misstated the law. *See* N.T. 2/26/92 at 834.

In addressing Metropolitan Edison's challenge, the trial court first rejected the suggestion that its instruction permitted the jury to award punitive damages based on merely negligent conduct. Basically, the court held that plain words of interrogatory number nine required the jury to find at least grossly negligent conduct before awarding punitive damages. The court then concluded that "the jury was permitted to award damages had they concluded that the grossly negligent conduct rose to the level of outrageousness under the court's instruction." The Takes advance a similar argument.

Unfortunately, the plain language of verdict interrogatory number nine allowed the jury to award punitive damages upon finding nothing more than grossly negligent conduct. We cannot rely on the court's oral explanation of outrageous conduct to correct the mis-worded interrogatory, because that too mistakenly incorporated the concept of negligence. The trial court never instructed the jury that negligent or grossly negligent conduct must rise to the level of outrageousness in order to support a punitive damages award.

Nor can we regard these language slips as harmless error. A lay juror might not appreciate the subtle distinctions our law gives to culpability terms such as negligent, reckless, willful and intentional. These are terms of art which describe a hierarchy of mental states. *See, e.g.,* 18 Pa.C.S.A. § 302 (defining culpability requirements for criminal laws). One might therefore posit that this entire issue, which lawyers and judges take so seriously, would not make much difference to a lay juror, and not have affected the outcome of the trial. Such a stance would be too cavalier. In this case, it

*Instructions Are Often Misunderstood,* National Law Journal, p. C1, 6/6/94. The law must still be accurately stated, though.

was crucial for the jury to understand that it could award compensatory damages for negligent conduct, but a punitive damage award required something worse than negligence, or even gross negligence: outrageous conduct. The court carefully explained the concept of negligence to the jury in charging on the first five interrogatories which covered Metropolitan Edison's negligence and Mr. Takes' comparative negligence. If the jury imported this concept of ordinary negligence into its punitive damage considerations, as the court's instructions invited it to do, then we must acknowledge the possibility that Metropolitan Edison could have been improperly penalized. Such error would mandate a new trial. *See Sweitzer v. Dempster Systems*, 372 Pa.Super. 449, 539 A.2d 880 (1988) (a new trial will be granted for an erroneous jury charge, even where the extent of the prejudice cannot be precisely determined).

We have concluded that there was no error which infected the jury award of damages to appellees on the basis of negligence, but that there was error which requires vacation of the award of punitive damages. We further conclude that it would be unfair to subject appellees to retrial on the compensatory damage award because of the error which affected the award for punitive damages and, thus, we award a new trial as to punitive damages only. We recognize that entitlement to punitive damages will require a specially constructed retrial where the jury will hear evidence of the facts and be duly instructed as to the issue of entitlement to and amount of punitive damages. To do otherwise would unreasonably subject appellees to retrial of the compensatory damage claim which we conclude has already been fairly won.[6]

Verdict and judgment for compensatory damages affirmed.

---

**6.** Appellant also claims that the compensatory and punitive damage awards were impermissably excessive. In view of our disposition, we need not address the argument as to punitive damages. (See, however, Footnote 3 *supra*). The claim as to compensatory damages is stated only in general terms and is not supported by any principled argumentation. We do not find the compensatory damages to be excessive.

Verdict and judgment for punitive damages reversed and vacated.

New trial awarded for punitive damages only.

OLSZEWSKI, J., files a dissenting opinion in which CIRILLO, and POPOVICH, JJ., join.

OLSZEWSKI, Judge, dissenting:

We respectfully, but emphatically, dissent. The three million dollar question in this case is whether Metropolitan Edison waived its right to a new trial by failing to make a timely objection to a flawed jury instruction. The record unambiguously and incontrovertibly shows that this issue was waived. The majority reaches the opposite conclusion only by ignoring the record, and by misconstruing our Supreme Court's well-known and oft-reaffirmed waiver rule in *Dilliplaine*. Because the majority's discussion omits key parts of the development of how the trial court defined outrageousness in terms of negligence (which we will call the "outrageousness as negligence" issue), we will review it in its entirety.

## I.

The fatal error in this case lurked within verdict interrogatory number nine, which dealt with punitive damages. It read:

Do you find that Metropolitan Edison acted in a **grossly negligent,** reckless, willful or wanton manner in causing injuries to Mr. Takes?

R. 44, verdict slip (emphasis added). As the majority correctly holds, neither negligence nor even gross negligence can support an award of punitive damages. Thus, this question misstated the law, and the parties were bound to bring this error to the attention of the trial court. Specifically, somebody needed to point out the offending language; only thus could the court be apprised of the mistake, and correct it before it became entrenched. Pa.R.A.P. 302, 42 Pa.C.S.A.[1]

1. Rule 302(b) reads:

The record contains only one specific objection on the subject of punitive damages. This objection did not mention the "outrageousness as negligence" issue, or even refer to verdict interrogatory number nine. Rather, it concerned the court's refusal to frame its punitive damage instructions with a particular fact situation. In discussing the court's charge to the jury, defense counsel argued:

> Therefore, Judge, taking that position, since I think the only scenario that makes it is they should be charg[ed] this way—and let me finish just this part—if you allow the jury to wander around in the fact combination with this blanket charge: do you find they acted in a negligent, willful and reckless manner is prejudicial to the defense in this instance—because it suggests that the court thinks any combination of the facts that they would choose could infer wanton and reckless negligence from those facts and that's just not the case.

N.T. 2/26/92 at 657. After more discussion, defense counsel again asked, "What happens to my proposition that the application of [punitive damages] is limited to a fact situation?" *Id.* at 661. The trial court then decided to give a general punitive damages charge, and refused to frame it with a specific fact situation. The court noted defense counsel's exception. *Id.* at 662–663. Defense counsel reiterated this objection when asked about how the verdict interrogatories should be ordered. *Id.* at 669–670, 670–671.

The majority's interpretation of this exchange is both unclear and unconvincing. It concludes from the above exchange that "counsel verbalized an objection to a charge which would permit elucidation of negligence concepts in the punitive damage charge." Majority op. *supra* at 108. This conclusion is wrong for two compelling reasons.

Any reading of this discussion shows that defense counsel's objection was over the court's refusal to define outrageousness in terms of a particular fact situation. Defense counsel never

**Charge to Jury.** A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or the omission complained of.

mentioned the verdict interrogatory, or its wording. In fact, defense counsel's language clearly shows that he also used the word "negligence" in describing the reckless indifference standard for punitive damages; that is, counsel used the same erroneous terminology as the flawed verdict interrogatory.

Secondly, the trial court itself concluded that this exchange concerned its refusal to define outrageousness in terms of a particular fact situation. Trial court opinion, 2/26/93 at 6; majority opinion at 142. This is the only specific determination that the trial court made about issue preservation. We agree with the majority that when the trial court offers its recollection of the record to make a determination about issue preservation, we should defer. Hence, we defer to the trial court here because, as the majority emphasizes, we have the trial court's *own conclusion* as to what this exchange was about. *Id.* The majority, contrary to its own statement of waiver policy, does not. Thus, the error in verdict interrogatory number nine went unnoticed during the charge conference.

During the court's instruction on the general principles of punitive damages, the following exchanges took place:

> [The Court, charging the jury]: . . . The amount of punitive damages awarded must not be the result of passion or prejudice against Metropolitan Edison on the part of the jury. The sole purpose of punitive damages and the only purpose for which you may make such an award, if you were to make such an award and set an amount of punitive damages, is to punish Metropolitan Edison's outrageous conduct, if you were to find it as such, and to deter Metropolitan Edison and others from commission of like acts.
>
> Question number nine asks that very question: Do you find that Metropolitan Edison acted in a **grossly negligent,** reckless, willful or wanton manner in causing injuries to Mr. Takes, and if you do, what damages do you find?

Gentlemen, are there any suggested corrections to the punitive damages, additions or corrections to the punitive damages instruction?

AT SIDE BAR:

[Defense counsel]: Just to that page, your Honor?

THE COURT: Yes, just to that page.

[Plaintiffs' counsel]: Your Honor, I would like you to request the court to charge the standard jury instruction on punitive damages, 1400.

THE COURT: I will do that.

[Defense counsel]: My only objection, your Honor, is I don't think that you have defined exactly the extent that you've got to go to show reckless.

THE COURT: A person's conduct is outrageous when he acts with a bad motive, or when he acts with a reckless indifference, and I'm about to charge that.

[Defense counsel]: Fine, Judge.

IN OPEN COURT:

[The Court, continuing to charge the jury]: ... A person's conduct is outrageous, and included among that would be reckless, **negligent,** willful or wanton, when that person acts with a bad motive or when he acts with reckless indifference to the interests of others. That is the definition with which we approach the issue.

*Id.* at 832–834 (emphasis added). Counsel still raised no objection to the use of "grossly negligent" in verdict interrogatory number nine. Moreover, the court exacerbated the error when it defined outrageousness in terms of ordinary negligence. Again, no objections were raised.

After finishing the charge, the court again asked for any suggested additions or corrections to the charge. Defense counsel responded, "Your Honor, I restate the Defendant's objection to the Court's charging on reckless and intentional and punitive damages." The jury then retired to deliberate, without any specific objection to the court's use of the terms "negligent" or "grossly negligent" in its charge on punitive damages.

The jury later returned with its verdict for the Takes. The verdict was read in open court.

> [Court clerk]:˙ Question number nine: Do you find that Metropolitan Edison acted in a **grossly negligent,** reckless, willful or wanton manner in causing injuries to Mr. Takes?
>
> [The jury foreperson]: Yes, we do.
>
> [Court clerk]: Question ten: State the amount of punitive damages you award for Plaintiff against Defendant?
>
> [Jury foreperson]: Three million dollars.

N.T. 2/26/92 at 848 (emphasis added). Again, no objections were raised, and the jury was dismissed. At this point, the error became irrevocably set. It is also at this point that waiver attached, because nobody had noticed or pointed out the "outrageousness as negligence" mistake.

If there could be any lingering doubt as to whether Metropolitan Edison missed this error, a look at Metropolitan Edison's post-trial motions must erase that doubt. Metropolitan Edison's motions for post-trial relief made **no mention** of the court's error in using the terms "negligent" and "grossly negligent" in defining punitive damages. Indeed, the motions persisted in defining outrageousness in terms of negligence, just as counsel did at the charge conference. The only punitive damage issue Metropolitan Edison raised was the issue it had preserved for appeal: whether punitive damages should have been limited to a single factual scenario. Metropolitan Edison's first motion for post-trial relief argued

> [t]hat the Trial Court erroneously refused Defendant's point for charge No. 26 which reads as follows:
>
>> 26. It is only if you find that the Plaintiff was advised by Metropolitan Edison that the capacitor was de-energized when Defendant Metropolitan Edison knew that it was not that you can find **willful and wanton negligence** on the part of Defendant Metropolitan Edison.

R. 70, Metropolitan Edison's Motion for Post–Trial Relief, ¶ 3 (emphasis added).[2] The two amended motions for post-trial

---

**2.** We note that the failure to include the issue in post-trial motions is also grounds for waiver under Pa.R.C.P. 227.1(b)(2). While the trial

relief added some claims, but still made no mention of the alleged error in the court's instruction. *Id.* The majority's claim that the "outrageousness as negligence" issue was included in post-trial motions is simply wrong. Majority op. at 124.

Despite never having been brought up at trial or in post-trial motions, the "outrageousness as negligence" issue suddenly appeared as the lead argument in Metropolitan Edison's brief in support of post-trial motions. It was also at precisely this point—between the filing and briefing of post-trial motions—that Metropolitan Edison hired additional counsel from the Pittsburgh firm of Reed Smith Shaw & McClay to augment its trial counsel team from the Bethlehem firm of LaBrum & Doak. R. 54, 69.

In its opinion on post-trial motions, the trial court first addressed the question of whether Metropolitan Edison specifically objected to the use of the terms negligent and grossly negligent in its charge on punitive damages. The court wrote that "[a] review of the record discloses that Met Ed did preserve **certain** objections on the punitive damages issue." Trial court opinion 2/26/93 at 3 (emphasis added). The court then reviewed the record of the jury charge conference and the charge itself, as laid out above. The court concluded:

> Thus it is clear that Met Ed's primary objection expressed at trial and intended to be preserved revolved around Met Ed's contention that punitive damages would not lie absent a finding by the jury that Met Ed's agent knowingly told the plaintiff that the capacitor was deenergized when he knew that it was not. The court rejected that contention. (N.T. February 26, 1992, pp. 661–662).

Having determined that Met Ed preserved its objections to the jury charge on punitive damages, as well as to the

court may overlook noncompliance with rule 227.1(b)(2) and choose to address an issue even though it was absent from post-trial motions, the issue must still have been preserved pursuant to *Dilliplaine:* that is, "it must be raised timely in pre-trial proceedings or during the trial, thus affording the court an opportunity to correct the error." Explanatory comment to rule 227.1(b)(1).

jury interrogatory concerning punitive damages, we now
address the substantive issues raised by Met Ed.

Trial court opinion 2/26/93 at 6; majority op. at 109–110.

These two paragraphs of the trial court opinion are crucial,
because they constitute the court's entire discussion of issue
preservation. The trial court recalled that the discussion and
objection at the charge conference concerned Metropolitan
Edison's request for a fact-specific framing of punitive dam-
ages. That is the only record objection the trial court pointed
to, and the only instance of preservation it discussed. The
trial court did not cite any place in the record where Metropol-
itan Edison specifically objected to the court's defining outra-
geousness in terms of negligence.[3] The trial court did not
even state that it recalled that the issue was raised and
preserved off the record. The trial court offered **no reason**
for its decision to ignore the Takes' compelling waiver argu-
ments. Rather, the trial court simply proceeded to review its
use of the terms negligent and grossly negligent in defining
punitive damages. The court concluded that the charge and
verdict interrogatories as a whole were consistent with the
law, and were therefore proper. Trial court opinion at 14.

We emphasize again that we agree with the majority's
statement that appellate courts should defer to a trial court's
specific recollections concerning issue preservation. That is
one reason why the objection during the charge conference
does not preserve the "outrageousness as negligence" issue—
because the trial court has **specifically** told us that this
objection went to a different issue. Unlike the majority, we
actually do defer to the trial court's specific recollection of the
trial proceedings.

The problem here is that the trial court has not given us
anything to defer to on the "outrageousness as negligence"
issue. It simply addressed it without discussing preservation
at all, even though the post-trial briefs disputed whether the

**3.** Of course, neither has Metropolitan Edison. We have taken care to
lay out this issue in full, and in proper chronology, to show that the
**very first time** the issue was mentioned was in Metropolitan Edison's
brief supporting its post-trial motions.

issue had been preserved. The trial court gave no reason for its implicit conclusion that the issue was preserved—no citation to the record, no discussion, not even an assurance that it recalled that the issue was raised, despite its conspicuous absence from the record.

Hence, the record compels us to conclude that the issue was missed. The waiver is palpable, not just from the utter absence of objection at trial, but also because of its conspicuous absence from post-trial motions. Waiver shines forth from the record like a beacon. Under such circumstances, the trial court must give us some reason not to find waiver. We might accept a trial court's assurance that despite the absence of record objection, it recalled the issue as being preserved. But here, the trial court has not done even this. We cannot defer when the trial court gives us nothing to defer to.

The majority, however, chooses to interpret the trial court's silence as a finding of issue preservation. It then chooses to defer to that implicit finding, treats the issue as preserved, and holds that the flawed verdict interrogatory requires a new trial. In so holding, the majority not only does violence to the record, it does even greater violence to our law of waiver as announced in *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

## II.

*Dilliplaine* requires trial counsel to make timely, specific objections during trial, to

ensure that the trial judge has a chance to correct alleged trial errors. This opportunity to correct alleged errors at trial advances the orderly and efficient use of our judicial resources.

\* \* \* \* \* \*

Appellate court consideration of issues not raised in the trial courts results in the trial becoming merely a dress rehearsal. This process removes the professional necessity for trial counsel to be prepared to litigate the case fully at trial and to create a record adequate for appellate review.

The ill-prepared advocate's hope is that an appellate court will come to his aid after the fact and afford him relief despite his failure to object to an alleged error. The diligent and prepared trial lawyer—and his client—are penalized when an entire case is retried because an appellate court reverses on the basis of an error opposing counsel failed to call to the trial court's attention. Failure to interpose a timely objection at trial denies the trial court the chance to hear argument on the issue and an opportunity to correct its error.

*Id.* at 257, 322 A.2d at 116.

This is the heart of our waiver doctrine. Our high court has emphasized its importance countless times, most recently in *McMillen v. 84 Lumber, Inc.*, 538 Pa. 567, 649 A.2d 932 (1994). It is not a technical procedural rule which may be overlooked by the trial court, like a rule 227.1(b)(2) violation.[4] Rather, it is substantive law, embodying a strong statement of policy. Both this court and the trial court are bound to apply it without regard to the result. *See McMillen, supra.*

[4] We emphasize that this case presents an issue of substantive, not procedural, waiver. If Metropolitan Edison had only failed to include the "outrageousness as negligence" issue in its post-trial motions, then the trial court could choose to overlook that defect, and we would be bound to do likewise. *American Association of Meat Processors v. Casualty Reciprocal Exchange,* 527 Pa. 59, 67, 588 A.2d 491, 495 (1991) (the purpose of rule 227.1 is to effect the waiver doctrine of *Dilliplaine:* to bring errors to the attention of the trial court so they can be corrected, rather than raising them for the first time on appeal; when the trial court is given sufficient opportunity to correct its own error, *Dilliplaine* is satisfied and further application of waiver for post-trial procedural error would be superfluous); *see also Kurtas v. Kurtas,* 521 Pa. 105, 555 A.2d 804 (1989) (Pa.R.C.P. 126 permits courts to overlook **procedural** defects in order to advance justice and fairness; thus, when a trial court chooses to ignore any technical non-compliance with rule 227.1, appellate courts should do likewise).

Here, counsel had every opportunity to bring the error to the court's attention and correct it during trial, but failed. When the jury was dismissed, the error became set. It was at this point that waiver attached—not at post-trial motions. The waiver here does not stem from a violation of a procedural rule, which the trial court is empowered to overlook under rule 126. Rather, it stems from the violation of the substantive law of *Dilliplaine,* which both the trial court and this Court must follow.

The trial court did not apply *Dilliplaine*, however. The question of preservation was joined—the Takes brief on post-trial motions strenuously argued that Metropolitan Edison had not preserved the "outrageousness as negligence" issue. As we have set forth at great length, the Takeses were correct. But the trial court ignored the waiver arguments before it, and addressed the issue anyway; it gave no reason for doing so. The question of first impression here is whether we are absolutely bound by the trial court's decision.[5] That is, can an appellate court make any determinations from the record concerning issue preservation, or must we accept every implicit trial court determination on issue preservation—even patently erroneous determinations which violate the law of waiver as set forth in *Dilliplaine?*

We cannot agree with the majority's affirmative answer. We do agree that we should give the trial court the greatest deference here, since it knows best what actually transpired at trial, and how well the record reflects these events. But this deference cannot be blind. The whole purpose of making a record at trial is so appellate courts can review it. Every trial attorney in this Commonwealth knows how vitally important it is to state timely, specific objections **on the record** in order to preserve them for appeal. Should a trial court be able to obviate the entire purpose of making a record and nullify the mandates of *Dilliplaine* just by addressing an issue? We do not think so. The policy behind deference is strong, but so is the rationale of *Dilliplaine*. Only in the rarest of cases will the waiver be so clear, the trial court's decision to ignore waiver be so unsupportable, and the consequences of ignoring

5. This Court has on occasion chosen to address issues on the merits because the trial court has elected to do so, despite our conviction that the issues were waived at trial. *James v. Nolan*, 418 Pa.Super. 425, 428, 614 A.2d 709, 711 n. 1 and n. 2 (1992); *Smith v. Brooks*, 394 Pa.Super. 327, 340, 575 A.2d 926, 932 n. 2 (1990), *alloc. denied*, 527 Pa. 621, 592 A.2d 42 (1991). In those cases, our deference did not implicate the policy behind *Dilliplaine* because we affirmed the trial courts' rulings. Whether we held the issues waived or addressed them on the merits, no new trials were required. Here, the consequence of deference is a new trial. Hence, for the first time we are presented with a true conflict between our ad hoc policy of deference on issue preservation and the mandates of *Dilliplaine*.

waiver be so weighty that an appellate court would be justified rejecting the trial court's decision on preservation. This, however, is precisely such a case.

We have outlined the waiver here at great length: despite the many opportunities, nobody mentioned the problem with verdict interrogatory number nine—not during trial, not after trial, not until **after** post-trial motions were filed, when Metropolitan Edison had hired new counsel. We have also discussed the trial court's failure to address the question of preservation: the court did not cite the record, discuss preservation, or even state that it recalled that the issue was raised, despite its obvious absence from the record. What remains is to consider the consequences of the majority's blind deference to the trial court's unsupported and unsupportable decision.

### III.

The consequence of the majority's holding is a new trial. *Dilliplaine's* purpose is to avoid the cost of new trials, both to the judicial system and to the parties. As the large record attests, this was a major and no doubt expensive trial. Post-trial and appellate proceedings have already taken more than three years so far, adding that much more expense, delay, and frustration. Now the majority orders a new trial. The costs to the judicial system are considerable; the costs to Stephen and Catherine Takes are far greater.

In an attempt to mitigate this burden, the majority has limited the new trial to the issue of punitive damages. Such a trial makes no sense, and is contrary to Pennsylvania law. Our research has revealed not a single case in this Commonwealth where a new trial was ordered on punitive damages alone. A new trial may be limited to damages, but only where the matter of damages is not intertwined with liability. *Lininger v. Kromer*, 238 Pa.Super. 259, 273, 358 A.2d 89, 96 (1976). To award punitive damages, a jury must determine the culpable quality of a defendant's conduct—that is, whether it acted outrageously. This requires a full trial on the facts. A jury could not be told that Metropolitan Edison is 100%

liable for Mr. Takes' injuries and still make unbiased factual determinations. As the majority concedes, liability is inexorably intertwined with punitive damages: a jury must determine what the culpable conduct is before it can decide if that conduct is outrageous. To be meaningful, a new trial would have to be a full trial, with all the attendant costs to the parties and court system. *Dilliplaine* is still subverted.

Still, the trial court might theoretically be able to conduct a full trial on remand, throw out any compensatory verdict, and keep only the possible punitive damage award. Even under this costly and burdensome procedure, it seems highly unlikely that a jury would award punitive damages this second time. At the first trial, the jury saw Metropolitan Edison try to justify, rationalize and blame Mr. Takes for the utility's clearly outrageous conduct. At a second trial, Metropolitan Edison could put on a very different face: it would apologize for this tragic mistake and open itself to as large a compensatory verdict as the jury cared to give, since the second jury's compensatory verdict would be a nullity. A strategy of contrition could effectively avoid a punitive damage award.

It is important to bear in mind that the purpose of punitive damages is to deter future outrageous conduct. When a jury sees a defendant try to justify its blatantly reckless conduct in court, it may rightly conclude that this defendant will continue its outrageous ways unless punished. *Cf. Boggavarapu v. Ponist*, 518 Pa. 162, 166–168, 542 A.2d 516, 518 (1988) (a jury may properly consider the way a case is presented in determining damages). A review of the trial testimony shows that Metropolitan Edison knowingly allowed Mr. Takes to paint a live, five kilovolt capacitor. This conduct is a paradigm of reckless indifference; public policy strongly calls for a punitive damage award to deter such conduct.[6] The majority's

6. *See Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984) (adopting Restatement (Second) of Torts, § 908(2)); *SHV Coal v. Continental Grain Co.*, 526 Pa. 489, 494, 587 A.2d 702, 704 (1991) (when an "actor knows … of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to that risk," this demonstrates a particularly high degree of culpability, which can justify a punitive

novel approach to a "limited" new trial thus both contravenes Pennsylvania law and effectively scuttles the policy behind punitive damages. It acts as a *de facto* remittitur, and a particularly unconscionable one.

## IV.

Thus we have a case which fully implicates the policy behind *Dilliplaine,* and brings to the fore the inherent tension between waiver doctrine and the majority's policy of blind deference to the trial court's preservation determinations. As the majority notes, this case is not the first time that we have been presented with a situation where an issue was waived, but we have deferred to the trial court decision to address it anyway. *See James v. Nolan,* 418 Pa.Super. 425, 428, 614 A.2d 709, 711 n. 1 and n. 2 (1992); *Smith v. Brooks,* 394 Pa.Super. 327, 340, 575 A.2d 926, 932 n. 2 (1990), *alloc. denied,* 527 Pa. 621, 592 A.2d 42 (1991).[7] In those cases, however, our deference came at no cost to the parties because we affirmed the trial court, and no new trials were needed. *See* fn. 5, *supra.*

Neither the *Nolan* nor *Brooks* courts announced any authority for their decisions to address issues that they were convinced had been waived at trial. While this policy of deference is rooted in sound principles of appellate practice, it is still an ad hoc policy. *Dilliplaine,* on the other hand, is controlling law.

Moreover, the question before us is not how we would balance our ad hoc deference policy against waiver policy; the question is how our Supreme Court would balance these two

damage award) (citing Restatement (Second) of Torts § 500, comment a).

Despite these strong facts, we must agree with the majority's conclusion that this error cannot be regarded as harmless. Majority op. at 148–149. To do so would plainly invade the jury's fact-finding province.

7. In both *Nolan* and *Brooks,* our deference to the trial court's preservation decision was not a major issue; we used footnotes to note our disagreement with the trial court's preservation determination and to defer nonetheless. Here, preservation is the central issue on appeal.

competing policies. As our high court has recently reminded us, it believes in the rationale of *Dilliplaine*, and will not countenance departures without compelling reasons. *McMillen v. 84 Lumber, Inc.*, 538 Pa. 567, 571, 649 A.2d 932, 934 (1994) (reversing Superior Court's overbroad application of public interest exception to waiver rule). Given our Supreme Court's repeated and forceful statements that it takes waiver seriously, we do not believe that it would follow the majority's course and allow *Dilliplaine* to be side-stepped by a trial court's oversight or mistake.

For indeed, that is the import of the majority's approach: it essentially holds that a trial court determination that an issue has been preserved can never be mistaken. The mere fact that a trial court treats an issue as preserved means that it has been preserved, and an appellate court is powerless to find otherwise. While we may accord a trial court great deference in many areas, confining our review to gross or palpable abuses of discretion, we can think of no other area where a trial court's finding would be utterly immune from review. As *McMillen* illustrates, lower courts may not always appreciate the sweep of a doctrine like waiver, or perhaps they may not fully understand how to implement it. Mistakes are possible. When they happen, we should acknowledge and correct them, not entrench and exacerbate them with an ad hoc policy of unconditional deference.

Two examples illustrate the danger of unconditional deference to trial court preservation determinations. Suppose the present situation were reversed: the trial court held in its opinion that an issue had been waived, even though counsel made timely, specific objections on the record. There can be little question that we would treat a properly preserved issue as preserved, despite the trial court's contrary opinion on preservation. *See Graham v. Sky Haven Coal, Inc.*, 386 Pa.Super. 598, 612, 563 A.2d 891, 898 n. 1 (1989) (en banc) (Brosky, J. concurring and dissenting). To do otherwise would be contrary to the law of waiver, and would unfairly punish a litigant for a trial court's mistake.

Likewise, unwarranted deference in the present posture also contravenes our waiver law, gives a windfall to the unprepared party and unfairly burdens the non-negligent party, all in contravention of *Dilliplaine*. In *James v. Nolan, supra,* our deference to the trial court's preservation determination was clearly unwarranted. The appellant in *Nolan* argued that the jury rendered an inconsistent verdict, but appellant failed to object to the verdict before the jury was dismissed. The trial court addressed the post-trial motion for a new trial because of verdict inconsistency, even though counsel might have solved any problem by pointing out the alleged inconsistency to the court while the jury was still impaneled. We felt that counsel's failure to object before the jury was dismissed constituted waiver, but we deferred to the trial court and addressed the issue on its merits. *Nolan, supra* 418 Pa.Super. at 428, 614 A.2d at 711, n. 1 and n. 2.

It is absolutely clear, however, that such delay does constitute waiver. *Philadelphia Police Dept. v. Gray,* 534 Pa. 467, 633 A.2d 1090 (1993); *Curran v. Greate Bay Hotel and Casino,* 434 Pa.Super. 368, 643 A.2d 687 (1994) (en banc); *Picca v. Kriner,* 435 Pa.Super. 297, 645 A.2d 868 (1994); *Krock v. Chroust,* 330 Pa.Super. 108, 478 A.2d 1376 (1984). We were correct that the issue had been waived, and the trial court was wrong—we should not have deferred. But because we affirmed the trial court on the merits, our mistake in deferring to the trial court's preservation decision became moot. If our review in *Nolan* would have resulted in reversing the trial court and ordering a new trial, it would have been in direct contravention of *Dilliplaine*. That is precisely what is happening in this case.

The only context where our high court has indicated that we might relax our application of waiver is in criminal cases. Since criminal defendants have a constitutional right to effective assistance of counsel, trial counsel's failure to preserve meritorious issues for appeal does not act as a permanent waiver; defendants may have a right to revisit waived issues with new counsel on appeal, or through the Post Conviction Relief Act. Thus in criminal cases, we may choose to ignore

possibly waived issues for purposes of judicial economy, in order to pre-empt future litigation. *See Commonwealth v. Sees*, 529 Pa. 450, 451, 605 A.2d 307, 308 n. 1 (1992). Civil litigants, however, have no right to effective assistance of counsel. We do not conduct new civil trials so that counsel can do a better job, but to correct errors which may have infected the verdict. *Dilliplaine* requires that we not give counsel a second bite at the apple unless counsel has preserved that error.

## V.

In sum, we have a case where the jury rendered a verdict based on a flawed interrogatory and instructions. The record shows that nobody noticed the mistake. We cannot emphasize enough how clear the waiver is: the mistake did not come to light until after post-trial motions were filed. Yet, the trial court addressed the issue. We do not know why. The trial court did not say why it was addressing this issue which so plainly had been waived. It gave no reason at all for ignoring the compelling waiver argument before it. The majority accepts this incorrect and unfathomable decision as binding, addresses the issue on the merits, and is compelled to order a costly and impractical new trial.

We feel certain that given its strong policy on waiver, our Supreme Court would not countenance this result. Waiver is about more than just discouraging gamesmanship. *Cf.* majority op. at 143. The central purpose of waiver is to motivate counsel to catch and fix errors at the trial level, so they do not become issues for appeal and necessitate new trials. *Dilliplaine, supra* 457 Pa. at 257–259, 322 A.2d at 116. Of course, counsel can only catch errors; it is up to the trial court to fix them. That is why we require counsel to preserve issues on the record. Just as trial courts can make mistakes which require new trials, so might a trial court make a mistake regarding issue preservation. To immunize this type of potential error from review completely frustrates waiver policy.

Hence, we think that an appellate court must exercise some limited review of a trial court's determination on whether an issue has been properly preserved. This should be the narrowest, most deferential review possible. We should accept the trial court's interpretation of the record, since it knows best what transpired at trial. We might even allow for the remote possibility that an objection might not appear on the record; if the trial court assures us that an issue was raised off the record, we may accept its determination.

But we must acknowledge that judges are not infallible. When a judge mistakenly treats an issue as having been preserved, we cannot be bound by that erroneous determination. To employ such a policy of blind deference "would substantially eviscerate the waiver principle." *McMillen, supra* at 571, 649 A.2d at 934. That is just what the majority does here, and accordingly we must dissent.

CIRILLO and POPOVICH, JJ., join.