**Wallach v. Stradley, Ronon, Stevens and Young**

C.P. of Philadelphia County, no. 3776.

*Elizabeth K. Ainslie,* for plaintiff.
*David Zalesne,* for defendants.

HERRON, *J.,* April 29, 1996—

## INTRODUCTION

The central issue in this case is whether the plaintiff, David Wallach presented sufficient evidence that the defendant Stradley Ronan, law firm, filed a securities act violation and R.I.C.O. claims against him without probable cause and with an improper purpose as defined by the Pennsylvania Wrongful Use of Civil Process Statute, 42 Pa.C.S. §8351 et seq. The issue raised is tortious, pitting as it does, an attorney's obligation to represent a client zealously against a wronged defendant's statutory claim for vindication against a groundless lawsuit.

Each side presented a conflicting view of the facts. The defendant law firm alleged that Wallach, a majority shareholder of the Wallach Group Inc., had failed to disclose material information concerning the financial status of WGI and the Wallach/Flynn-Reich securities partnership when he purchased Nachmann's 11 percent interest for $31,500 in December 1986. *Nachmann v. Wallach,* (E.D. Pa. no. 88-8746 November 15, 1988), complaint ¶14. The defendant emphasized, in particular, that shortly after this December 1986 stock purchase, WGI sold its assets for 2.2 million dollars. *Id.* at ¶18.

Wallach, in contrast, presented evidence that at the time he purchased Nachmann's stock, WGI had a net worth of $300,000 with an outstanding debt of $200,000 to Continental Bank. T. at 77; 280; D-5, no. 100009. Hence, the purchase price of $31,500 for an 11 percent interest was reasonable. WGI was able to sell its assets for 2.2 million because of an unforeseen rule change by the SEC which made its stock option specialist books valuable commodities. T. at 68-69. All of this information, Wallach contended, was readily available to the defendant law firm upon reasonable investigation, but it nonetheless filed suit against him without probable cause. It was these issues—among others—that the jury had to decide.

## PROCEDURAL BACKGROUND

On November 15, 1988, defendant law firm filed a complaint on behalf of Warren Nachmann against David Wallach, D.H. Wallach Options Inc. and the Wallach Group Inc. Both Nachmann and Wallach had been shareholders of the Wallach Group Inc. until December 1986 when Wallach purchased Nachmann's minority interest in the company. It was this stock transaction

that was the focal point of the action, Nachmann action, filed by the defendant law firm.

The Nachmann complaint asserted that in this transaction Wallach had violated section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq. through an allegedly fraudulent stock purchase. It alleged, more particularly, that Wallach had "conducted, and/or participated in the conduct of, the affairs of WGI and D.H. Wallach through a pattern of racketeering activity." *Nachmann v. Wallach* (E.D. Pa. no. 88-8740), complaint ¶38(b).

At the time this complaint was filed against him, David Wallach was a senior vice president at Kidder Peabody—a new position that he had held for only six months.[1] Because of this suit, he was obliged to inform the compliance officer of his firm as well as his superiors that this action had been filed against him. T. at 92-94. He was confused by the R.I.C.O. charges that had been leveled against him and was especially concerned with potential criminal implications. T. at 85-86. In particular, he worried that the treble damages sought would devour all of his financial resources. T. at 86. Moreover, he was embarrassed that these charges may have been published in legal newspapers since many of his clients were either lawyers or were referred to him by lawyers. T. at 87.

The attorney who filed the Nachmann action, William Barker, had also filed an earlier complaint against Wallach on behalf of the heirs of David Warner in February 1988.[2] This earlier Warner complaint differed from the

---

1. Wallach began working in the securities field in 1955. T. at 50.

2. This complaint was filed on behalf of David Warner's heirs but was not served until several months later, approximately April

subsequent Nachmann action, however, because initially it did not assert violations of R.I.C.O.; rather it set forth claims for common law and securities act fraud.[3]

In April 1989, the Nachmann and Burstein actions were stayed by the federal court and referred to an NASD arbitration.[4] A year later in April 1990, Wallach suffered a massive heart attack. T. at 91.

In October 1990, the NASD arbitration panel decided in favor of Wallach on all of Nachmann's claims arising out of the sale of his interests in WGI. Nachmann's claims in federal court were therefore dismissed. T. at 90-91; defendant's brief at 3. The "Warner" action was subsequently settled.[5]

Wallach subsequently filed an action for wrongful use of civil process in October 1991 against the defendant law firm that had filed the Nachmann action against him. A four day trial before a jury was held between November 6 through November 9, 1995. The jury returned a verdict of $235,000 in compensatory damages in favor of plaintiff Wallach.[6] The jury was

1988. T. at 238, 242. Barker filed another complaint against Wallach on behalf of Isadore Burstein on November 15, 1988. T. at 259-61, 263.

3. T. at 71, 102, 238-40. In November 1988, Barker filed a motion to amend this complaint to assert R.I.C.O. violations. T. at 253.

4. Defendant's brief at 3.

5. Prior to trial, plaintiff had filed a motion in limine seeking to exclude reference to this settlement during trial. The court ruled in plaintiff's favor. Nonetheless, in opening argument defense counsel told the jury that the Warner action was not at issue in this case because "that case did not terminate in Mr. Wallach's favor." T. at 107.

6. In response to the interrogatory, the jury foreperson stated that the jury concluded that the plaintiff had incurred $185,000 in legal fees and $50,000 in emotional distress. It did not find that the plaintiff

then presented with additional testimony on the issue of punitive damages. After considering this testimony by Barker, it returned a verdict of $500,000 in punitive damages. T. at 471-91, 497.

The defendant law firm filed timely motions for post-trial relief. It seeks either a judgment in its favor notwithstanding the jury verdict, a new trial or an order vacating the award of punitive damages. For the reasons set forth below, this motion is denied.

## DISCUSSION

### I. *Elements of a Wrongful Use of Civil Process Action*

In seeking post-trial relief, the defendant law firm argues that plaintiff Wallach failed to establish key elements of his claim for statutory wrongful use of legal process, 42 Pa.C.S. §§8351-54. The statute sets forth the following elements for a wrongful use of process claim:

"(a) *Elements of action*—A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

"(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

"(2) The proceedings have terminated in favor of the person against whom they were brought." 42 Pa.C.S. §8351.

---

incurred any medical expense as a result of the Nachmann action. T. at 473-75.

Defendant law firm presents at this late point in the proceedings, the argument that the issue of probable cause "is a matter of law for the court to decide." Defendant's brief at 13. This is the first time it has raised this issue.[7] A review of the docket entries, for instance, reveals that no motion for judgment on the pleadings or summary judgment motions were filed in this complex case. Moreover, in a meeting between counsel and the court to discuss the jury charge on the issue of probable cause, defense counsel failed to raise the issue that "as a matter of law" the issue of probable cause should not be submitted to the jury. On the contrary, defense counsel requested "on probable cause and burden of proof, I think we should follow the statute which has specific provisions on both." T. at 334. More specifically, counsel urged that the court follow the "specific statutory requirement that the de-

---

7. The defendant does not indicate in its brief the transcript pages where it presented this issue to the court before this point. See defendant's brief at 3. A review of the record indicates that defendant did move for a nonsuit at the close of plaintiff's case but at least in the transcribed record it did not specifically raise the issue that probable cause should be decided by the court as a matter of law. See T. at 218-26. Defense counsel made the following statement in seeking a nonsuit: "My request is, if this [sic] the end of the case, my request will be for a nonsuit on the entire case; but with respect to punitive damages, my request is that she has not made a showing and that should be dismissed." T. at 223. The defendant, in moving for a directed verdict at the end of the case, argued that *"on all the evidence there is absolutely no evidence of gross negligence or an absence of probable cause and no reasonable jury can find on this record for the plaintiff."* T. at 441. Defendant is thus not quite arguing that the existence of probable cause is a pure issue of law; rather, it suggests that this is an issue of fact—and there are no supporting facts on this record. This point is refuted by an analysis of the evidence produced by plaintiff.

fendant bears the burden by a preponderance of the evidence." T. at 334.

Probable cause for a wrongful use of civil proceedings action is set forth in the statute as follows:

"Existence of probable cause

"A person who takes part in the procurement, initiation or continuation of civil proceedings against another has probable cause for doing so if he *reasonably believes* in the existence of the facts upon which the claim is based and either:

"(a) Reasonably believes that under those facts the claim may be valid under the existing or developing law;

"(b) Believes to this effect in reliance upon the advice of counsel, sought in good faith and given full disclosure of all relevant facts within his knowledge and information; or

"(c) Believes as an attorney of record, in good faith that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party." 42 Pa.C.S. §8352. (emphasis added)

Cases interpreting this statute have concluded that probable cause is a matter of law for the court "under an admitted or clearly established set of facts." *Gentzler v. Atlee,* 443 Pa. Super. 128, 135-36, 660 A.2d 1378, 1382 (1995), *appeal denied,* 543 Pa. 694, 670 A.2d 142 (1995) (quoting *Dietrich Industries Inc. v. Abrams,* 309 Pa. Super. 202, 455 A.2d 119 (1982)). This language suggests that where facts are not admitted or clearly established—as in the present case—the determination of probable cause is for a fact-finder or jury. Indeed, the Superior Court in *Gentzler, supra,* suggested the role of a jury in this kind of action when it observed

that "an action for wrongful use of civil proceedings will be upheld if the *trier of fact* could reasonably conclude that the defendant initiated the underlying lawsuit without probable cause." *Id.* at 141, 660 A.2d at 1385. (emphasis added)

In *Ludmer v. Nernberg,* 433 Pa. Super. 316, 640 A.2d 939 (1994), *appeal denied,* 541 Pa. 652, 664 A.2d 542 (1995), the issue, inter alia, of probable cause was considered by a jury in a wrongful use of process case. "[I]t is the function of the jury," the *Ludmer* court emphasized, "to evaluate evidence adduced at trial to reach a determination. . . . When, as here, a verdict is based on substantial, albeit, conflicting evidence, it is conclusive on appeal." *Id.* at 326, 640 A.2d at 944. See also, *Wainauskis v. Howard Johnson Co.,* 339 Pa. Super. 266, 277, 488 A.2d 1117, 1121 (1985) (in a malicious use of prosecution case, probable cause is an issue for the jury where material facts are in controversy).

Defendant cites the Restatement (Second) of Torts §681B as support for its assertion that probable cause is a matter of law for the court. Defendant's brief at 13. This section of the Restatement, however, stands for a significantly different proposition and helps clarify the role of court and jury in actions for wrongful use of process:

*"Section 681B. Functions of court and jury*

"(1) In an action for wrongful civil proceedings, the court determines whether

"(a) a civil proceeding has been initiated;

"(b) the proceeding was terminated in favor of the plaintiff;

"(c) the defendant had probable cause for the action; *if the facts are established, the court determines whether*

*probable cause existed; if the facts are in dispute they are determined by the jury;*[8]

"(2) In an action for wrongful civil proceedings, subject to the control of the court, *the jury determines*

"(a) the circumstances under which the proceedings were initiated insofar as may be necessary to enable the court to determine whether the defendant had probable cause for initiating them;

"(b) whether the defendant acted primarily for a purpose other than that of securing the proper adjudication of the claim on which the proceeding was based." Restatement (Second) of Torts §681B (1976 & 1981 App.). (emphasis added)

In the instant case there were issues of fact concerning the "circumstances under which the proceedings" against Wallach "were initiated." There were, for instance, material issues of fact concerning the credibility of Barker, an attorney from the defendant law firm who initiated this R.I.C.O. action and whether he reasonably believed in the existence of the facts upon which his R.I.C.O. claim against Wallach was based. There was conflicting evidence and hence material issues as to the "reasonableness" of the defendant law firm's investigation of the value of the WGI stock and of WGI itself; the defendant law firm's characterization of Nachmann as either an "insider" or "outsider" was in dispute; there were issues of fact about who initiated the December 1986 stock sale; there were issues of fact as to the kind of information Nachmann may have received from WGI prior to the stock sale and the extent of the defendant law firm's investigation of such issues; there was a factual issue as to when Barker learned

---

8. The italicized sentence was denominated as "new" in the Restatement of the Law (Second) of Torts (1981 App.).

of the rule change by the SEC in mid-1987 that made the option specialist books of WGI a valuable commodity. These factual issues required determination by a jury.

## II. *Judgment N.O.V.*

### A. Standard of Review: Judgment N.O.V.

The standards for reviewing defendant's motion for judgment notwithstanding the verdict are well established. In granting judgment n.o.v. a court directs a verdict in favor of a losing party despite a contrary verdict by a jury. Hence, a judgment n.o.v. should only be granted in a clear case where the evidence is insufficient to support a verdict. *Robertson v. Atlantic Richfield Petroleum Products Co.,* 371 Pa. Super. 49, 58, 537 A.2d 814, 819 (1987), *appeal denied,* 520 Pa. 590, 551 A.2d 216 (1988). When reviewing a motion for judgment n.o.v. the evidence should be viewed in a light most favorable to the verdict winner who must be given the benefit of every reasonable factual inference. Any conflict in evidence must be resolved in favor of the verdict winner. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992). In fact, when considering a judgment n.o.v. motion, only evidence supporting the verdict may be considered. *Wainauskis v. Howard Johnson, supra* at 270, 488 A.2d at 1119.

A judgment n.o.v. should not be used to invade the role of the jury. Rather questions of fact must be resolved by it. *Ludmer v. Nernberg, supra* at 322, 640 A.2d at 942. As the Pennsylvania Supreme Court has cautioned: "A judge's appraisment of evidence is not to be based on how he would have voted had he been a member of the jury but on the facts as they come

through the sieve of the jury's deliberations." *Moure v. Raeuchle, supra* at 402, 604 A.2d at 1007. To evaluate whether the jury's verdict in favor of Wallach's wrongful use of process against the defendant law firm should be set aside, it is necessary to focus initially on the factual background of the disputed stock transaction. Once this factual context is set, the frame of reference must shift to the defendant law firm's actions in initiating the Nachmann action against Wallach as presented to the jury through testimony or documentation. In essence, we must analyze the play within the play.

## B. Factual Background: The Principal Players and Financial History of the Wallach Group

### 1. *The principal players of WGI, Inc.: Wallach, Burstein, Warner and Nachmann*

The Nachmann complaint that was filed against Wallach in November 1988 named three defendants: D.H. Wallach Options Inc., the Wallach Group Inc. and David Wallach. The defendant law firm had also filed actions against David Wallach on behalf of two other plaintiffs: Isadore Burstein and David Warner. The interrelationship of these parties and their holding company, WGI, is therefore extremely relevant.

In his testimony, David Wallach outlined the history of his relationship with Nachmann, Burstein, Warner, their holding company WGI Inc. and its subsidiaries. After many years in the investment business, Wallach decided to strike out on his own. In 1975, he purchased a security firm by becoming its major stockholder and renaming the company D.H. Wallach. T. at 52. Warren Nachmann began working at D.H. Wallach around 1976 as chief financial officer and treasurer. Like Wallach, he had spent most of his past professional experience

in the securities field. T. at 52. In addition, he was a certified public accountant. T. at 53. Nachmann remained with D.H. Wallach for approximately the next 10 years until a date that is in dispute.[9]

Isadore Burstein and David Warner had been original stockholders in the predecessor company to D.H. Wallach. They opted to remain with D.H. Wallach as minority shareholders. Warner became chairman of the board of directors; Burstein was secretary of the company and sales manager.[10]

### 2. Financial history of the Wallach Group: 1985 to mid-1986.

By 1985, a holding company had evolved called the Wallach Group Inc. Its largest subsidiary was its options company. There was also D.H. Wallach Inc., a retail organization doing business in Philadelphia; Wallach Securities of New Jersey, a New Jersey subsidiary; and Wallach Securities of Florida, a Florida subsidiary. In addition, there was an engineering firm. T. at 53-54.

The Wallachs were the majority shareholders of the holding company with 67 percent of the shares, while Burstein, Warner and Nachmann were minority shareholders, each holding 11 percent of the stock. T. at 56, 59. The shareholders owned shares of the holding

---

9. Nachmann has maintained that he was fired in April 1985. T. at 180-81. Wallach presents a different view: he stated that when the retail portions of D.H. Wallach were sold to Thompson-McKenna, Nachmann was offered a new position but he refused it. In any event, Wallach stated that Nachmann did not resign until March 1986. T. at 61. He supports this position by reference to a letter of resignation dated March 13, 1986. See P-16.

10. T. at 53. Burstein ultimately went with Thompson-McKenna but David Warner did not. T. at 57. The complaint that was filed against Wallach was on behalf of David Warner's heirs. T. at 237-38.

company which included all the assets and liabilities of the subsidiaries. All the revenues and liabilities of the subsidiaries were brought up to the holding company. T. at 59-60.

A disputed issue in this case was the financial viability of the Wallach Group and especially of its options subsidiary. Wallach's testimony portrayed a company that was in extremely poor financial condition in 1985. At that point, Wallach testified, the financial condition of the company was bleak—with a negative net worth of $1,800,000. T. at 54. He characterized it as on the "brink of financial disaster" requiring that "something be done." T. at 54-55. Another company, Thompson-McKenna, expressed an interest in purchasing the Wallach Group's retail company. Wallach stated that they had no interest in the options company because they regarded it as too risky. This deal was negotiated. T. at 55.

The Wallach Group thereafter liquidated all the other companies except for the options company. T. at 56. Although Thompson-McKenna paid the Wallach Group $300,000 over the course of three years, this money was used to retire the debt which still remained. After this purchase, Wallach Options was actually the surviving company of Wallach Group Inc. T. at 57. Sometime around 1985, it entered into a joint venture with another options specialist company that had its own trading books. After this merger, the new entity was D.H. Wallach/Flynn-Reich Options Company T. at 57.

The exact role of Warren Nachmann in 1985 is another key issue. At this point, Wallach and Burstein had decided to go with Thompson-McKenna; Nachmann, according to Wallach, refused an offer to go as well. T. at 57. In his testimony, Wallach stated that Nachmann nonetheless continued to play an active role in Wallach

240

Options after April 1995. He remained employed by the company—at this point Wallach Options "was the only company remaining"—and oversaw the liquidation of the other subsidiaries in the ensuing months. T. at 58. At this point in 1985, all the shares of the stock were in the holding company; all the losses and profits of the subsidiaries were reflected in the holding company's balance sheet. T. at 59.

Wallach testified that "into" early 1986 Nachmann continued because of his role of chief financial officer and treasurer of the holding company to have possession of all the books and records for the holding company and its subsidiaries; he had authority to sign all checks and was "in a position of complete trust in the company." T. at 61. Nachmann maintained possession of all the books and records at his home in Cheltenham which they left, in bits and pieces, in 1986. T. at 61. It was not until March 1986, according to Wallach, that Nachmann resigned. T. at 61. In support of this, plaintiff offered a letter dated March 13, 1986 from Warren Nachmann to David Wallach as follows:

"Dear David:

"Please accept my resignation as treasurer of the Wallach Group Inc. and its related companies effective immediately." P-16.

Nachmann, in contrast, stated that he stopped working for D.H. Wallach or any related company a year earlier—in April 1985. T. at 180. Prior to that, he had been financial officer in charge of the financial records. T. at 180-81.

This conflicting testimony was significant since it goes to the heart of the issue of Nachmann's status as an "insider" in the company. Joint questions of fact—and credibility—were thus framed for the jury—on which plaintiff presented ample credible evidence.

When considering a motion for judgment n.o.v., such conflict in testimony must be resolved in favor of the verdict winner.

## C. The Genesis of the Nachmann 10b-5 and R.I.C.O. Actions Against Wallach

### 1. *The essential elements of a securities act violation claim*

The central issue at this point—whether the jury's verdict that the defendant wrongfully initiated a civil action against Wallach under 42 Pa.C.S. §8352 et seq. is supported by credible evidence—hinges on the series of stock transactions that occurred in 1986.

In February 1986, two of the minority stockholders in the Wallach Group, Burstein and Warner, sold their shares to Wallach for $11,000. T. at 62; Defendant's brief at 8. At the end of December 1986, Wallach purchased Nachmann's stock in WGI for $31,500. T. at 67. It was on the basis of these transactions that the defendant law firm filed its Nachmann complaint against Wallach alleging, inter alia, violations of section 10(b) of the Securities Act of 1934 and of the R.I.C.O. Act.

Section 10(b) of the 1934 Securities and Exchange Act prohibits the use of fraudulent schemes in the sale or purchase of securities. Rule 10b-5 of the Securities and Exchange Commission was enacted to facilitate these statutory purposes. *Thomas v. Duralite Co. Inc.,* 524 F.2d 577, 583 (3d Cir. 1975). Rule 10b-5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," in connection with the purchase or sale of any security. Rule 10b-5 as quoted by *Thomas v. Duralite Co. Inc., supra* at 583.

To establish a viable claim under section 10b and Rule 10b-5 a plaintiff must plead the following elements in his complaint: "(1) a false representation of (2) a material (3) fact (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it (although recklessness, as opposed to actual intent, will suffice) (5) the plaintiff's reasonable reliance on it and (6) his resultant loss." *Zlotnick v. TIE Comm. & L.W.,* 836 F.2d 818, 821 (3d Cir. 1988). See also, *Thomas v. Duralite, supra* at 583.

Cases in which a plaintiff alleges that a defendant violated the act through failure to disclose—or an omission—of a material fact are also cognizable. The U.S. Supreme Court has established that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation." *Affiliate UTE Citizens v. U.S.,* 406 U.S. 128, 153-54 (1972). (citations omitted)

Courts in the Third Circuit interpreted *Affiliated UTE* as creating a rebuttable presumption in nondisclosure

cases. See *e.g., Rochez Brothers Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir. 1974), *on remand,* 390 F. Supp. 470 (W.D. Pa. 1974), *affirmed,* 527 F.2d 880 (3d Cir. 1975); *Dower v. Mosser Industries Inc.,* 488 F. Supp. 1328, 1335 (E.D. Pa. 1980), *affirmed,* 648 F.2d 183 (3d Cir. 1981). Under this presumption, when a plaintiff alleges that material facts were not disclosed, positive proof that the plaintiff relied on this information was not required.[11] "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of the decision." *Dower, supra,* 488 F. Supp. at 1335. This presumption of reliance can, however, be rebutted. But the burden of proving that the plaintiff did not rely on the omission shifts to the defendant. As the Third Circuit stated in *Rochez Brothers, supra* "the burden of proof rests squarely upon defendant to establish nonreliance of plaintiff." *Id.,* 491 F.2d at 410.

If the plaintiff is an insider, a somewhat different standard applies. In *Rochez Brothers, supra* the Third Circuit emphasized that "before an insider may claim reliance on a material misrepresentation or nondisclosure, *he must fulfill a duty of due care* in seeking to

---

11. The Third Circuit recently observed that in an action under 15 U.S.C. §78j and Rule 10b-5, the "ultimate materiality of an omission should not be decided as a matter of law unless reasonable minds could not differ." *Lewis v. Chrysler Corp.,* 949 F.2d 644, 652 (3d Cir. 1991). Defendant's expert legal witness, Professor John C. Coffee of Columbia Law School agreed with this view. As he testified at trial when asked about the materiality of an omission: "I certainly— materiality is a question of fact. That's a mixed question of fact and law. *The jury generally makes these determinations* but I certainly have a view about whether this information was material, and my view would certainly be that it was material." T. at 380. (emphasis added)

ascertain for himself the facts relevant to a transaction." *Id.*, 491 F.2d at 409. (emphasis added) However, if the plaintiff lacked an opportunity to uncover the fraud, he cannot be held to have failed to exercise due care. *Id.*

These legal principles outline the framework within which defendant law firm sought to establish its section 10b and Rule 10b-5 securities act claim against Wallach. Plaintiff provided the jury with ample evidence that the defendant law firm lacked probable cause in bringing the Nachmann securities act violation claim against Wallach.

### 2. *Nachmann's December 1986 stock sale to Wallach.*

The stock transaction at issue in this case occurred in December 1986, but key events prior to this event are critical to the parties' respective arguments. In July 1986 a brief shareholders' meeting was held. Nachmann attended accompanied by his attorney, Donald Collins, a partner with the defendant law firm. Wallach attended with his company's attorney Sam Dennis. T. at 64. In the course of this meeting either Collins or Nachmann requested financial information. T. at 65, 182, 188. Wallach testified that he agreed to this request and asked the company's accountant, Benson to forward it on to them.[12] At this point, Nachmann offered to sell his stock to Wallach for $100,000. Wallach dismissed this offer as "ludicrous, because he believed that the stock lacked this value since the company had a negative net worth and was still paying off its debt." T. at 65.

---

12. T. at 65. Collins stated in his deposition that he told Dennis, Wallach's attorney, to forward the information directly to Nachmann because he was an accountant. T. at 190.

Between the stockholders' meeting and December 1986, Wallach and Nachmann did not communicate on this issue. Neither Nachmann nor Collins (from the defendant law firm) followed up on their request for financial information. T. at 185, 187, 194. Then in December 1986, they entered into negotiations for a stock sale. Wallach did not recall who initiated the negotiations. T. at 66. Wallach's attorney, Sam Dennis, thought that Collins had called him to convey Nachmann's intent to sell his stock. T. at 145. Collins believed that it was Dennis who initiated the negotiations. T. at 191.

In any event, Wallach authorized his attorney to pay up to $50,000 for Nachmann's stock. T. at 66. Nachmann's posture during these negotiations raises highly significant issues. Nachmann recalled that Wallach's first offer was $20,000. He and Collins discussed this offer and the fact that they had not yet received any financial information. He rejected this offer, telling Collins that "if we're going to negotiate in the blind see what else we can get." T. at 184. He admitted that in the past six months he had made no attempt to get this information.[13] T. at 185. In any event, he told Collins that "if we were going to do the deal we have to do it by December 31, 1986 in order to take advantage of the change in the tax law." T. at 185.

Collins recalled that at the time of the shareholders' meeting in July 1986 Nachmann was convinced that there were "substantial assets in the company." T. at

13. There is some conflict as to whether Nachmann might, in fact, have received some information from WGI. In deposition, Collins stated that "some information, some statements, but nothing that was helpful" had been sent to Nachmann. T. at 294. (Deposition testimony of Collins read during cross-examination of Barker.)

188. When Collins subsequently entered into negotiations in December 1986 with Wallach's attorney, Dennis, Collins also recalled discussing with Nachmann their lack of knowledge about the company. He recalled telling Nachmann that "maybe he's willing to buy it because there is a lot more there but we don't know that." T. at 193. Then Collins observed: "On the other hand, $30,000, $31,500 now, at that point Dennis hadn't agreed. I said thirty-one five, it's cash in your pocket and you can go. The bird is worth two in the bush." T. at 193. Nachmann expressed his concern about closing the deal to benefit from the change in the capital gains tax law. T. at 193. Collins acknowledged that he had made no attempt to contact Wallach for more financial information between July and December 1986. T. at 194. In any event, they finally agreed on a price of $31,500.[14]

For the first months of 1987, Wallach was still working with Thompson-McKenna. In May or April he learned that the Securities and Exchange Commission had changed its regulations for option specialist books. This rule change, Wallach testified, transformed the option specialist books into valuable commodities that could be sold. Hence, in June or July 1987, Wallach sold his share of the joint venture to Flynn-Reich for 2.2 million dollars. T. at 68-69. Wallach stated that he did not know about this rule change at the time of the stock sale to Nachmann in December 1986, although he was aware of public hearings on this possibility at that time. T. at 70.

---

14. T. at 67. Dennis testified that in their negotiations, Collins never asked for any additional financial information about the company. T. at 147.

Plaintiff zeroed in on the legal significance of these actions through the testimony of its legal expert, Edward Rock, a full professor of law at the University of Pennsylvania. In preparation for his testimony, Professor Rock had reviewed depositions of Nachmann, Collins and Barker; transcripts of the testimony of the various parties before the NASD arbitration panel; the complaint; and applicable law. T. at 199. He purposefully did not review deposition testimony of either Wallach— or his attorney, Dennis—because Professor Rock wanted to view the case solely from their perspective on the facts; he thereby suggested that he intended to view the case from the perspective of an attorney in the throes of determining whether there was a reasonable basis for a securities violation or R.I.C.O. action against Wallach. See *generally* T. at 199.

After reviewing these documents, Professor Rock concluded: "My opinion was that under 10b-5, under the federal securities law, there was no probable cause for bringing an action against Mr. Wallach." T. at 199. Significantly, the defense raised no objection at this point. See T. at 198:11-200:23.

In explaining his conclusion, Professor Rock emphasized that under 10b-5 it must be shown that there was a misrepresentation of material fact upon which a person relies to his detriment. T. at 205. After reviewing the deposition testimony of Collins and Nachmann that plaintiff's attorney had read to the jury, Professor Rock characterized Nachmann as someone "who knew how the business was structured, who was an insider in the business, who had some thought that maybe there was more value in the business than he knew about, who asked for more information. He says he didn't get the information and proceeded anyway. There was this bit of information that he seemed to have wanted

that he says he didn't get, he says he knew he didn't get it but proceeded anyway. There was a fact he says that he didn't know but he knew he didn't know that fact." T. at 205. From these facts, Professor Rock concluded:

"The courts have taken the view under the federal securities laws that where there is someone who is an insider who knows the structure of the business, where there is a fact that the person knows he doesn't know but proceeds anyway, then it's not misleading. It may or may not be a misrepresentation, it may or may not be material, but if you know you don't know, according to the cases, and proceed anyway, then it's not securities fraud because you haven't been misled."[15]

Once again, defendant raised no objection. See T. at 202-207. By juxtaposing the deposition testimony of Collins and Nachmann with this expert opinion plaintiff sought to establish his claim that the securities violation action brought against him by the defendant law firm was without probable cause.

Defendant now argues that Professor Rock's testimony was wrong as a matter of law. Defendant's brief at 17-21. Defendant is precluded, however, from raising these arguments at this point because—as indicated above—it failed to object at key points throughout Professor Rock's testimony. It is well established that "to

---

15. T. at 205-206. See also, Arthur Matthews, "Shifting the Burden of Losses in Securities Markets: The Role of Civil R.I.C.O. in Securities Litigation," 65 Notre Dame L.Rev. 896, 918 (1990). ("A plaintiff must rely on defendant's fraudulent conduct; a Rule 10b-5 private damages cause of action will not be available to a plaintiff who was fully aware of the false, misleading or deceptive nature of defendant's conduct.")

preserve an issue for appeal, a litigant must make a timely and specific objection at trial." *Noecker v. Johns-Manville Corp.,* 355 Pa. Super. 463, 471, 513 A.2d 1014, 1018 (1986). See also, *Ludmer v. Nernberg, supra* at 328, 640 A.2d at 945; *Estate of Hannis v. Ashland State General Hospital,* 123 Pa. Commw. 390, 395, 554 A.2d 574, 577 (1989) (where party agreed to permit expert's testimony within certain limits objection was not preserved at trial); *U.S. v. Bilzerian,* 926 F.2d 1285, 1294-95 (2d Cir. 1991), *cert. denied,* 502 U.S. 813 (1991) (where no objection was raised to securities law expert's testimony the issue was waived). If defendant had objected to Professor Rock's testimony at the time of trial, the court and opposing counsel would have had an opportunity to consider the merits of its arguments. Alternatively, defendant always had the opportunity to raise its legal arguments as to the expert's testimony through its cross-examination of him.

### 3. *The circumstances under which the Nachmann litigation against Wallach was initiated*

The central focus in analyzing Wallach's wrongful use of process claim against the defendant law firm must be on the "circumstances under which the proceedings (against Wallach) were initiated." Restatement (Second) of Torts §681B(a). In establishing his wrongful use of process claim against the defendant law firm, plaintiff produced evidence that the defendant attorney did not "reasonably believe in the facts upon which" the underlying securities act violation "was based." Plaintiff thereby established that the defendant law firm lacked probable cause as defined by 42 Pa. C.S.A. §8352 when it filed the Nachmann complaint against Wallach on November 15, 1988.

## A. The First Predicate Act: The Warner Action

The genesis of the Nachmann action against Wallach from the perspective of the attorneys who initiated it was described, inter alia, through the testimony of the attorney who oversaw this action in federal court, William Barker as well as in the deposition testimony of Donald Collins, the attorney from the defendant law firm who negotiated the stock sale for Nachmann. Barker originally became involved with this controversy when he gave advice to Collins, a bankruptcy/securities lawyer with his firm. T. at 230. Barker learned sometime in 1986 that Collins intended to file a statement of claim with the Philadelphia Stock Exchange on behalf of David Warner against Wallach. T. at 230. Barker was concerned that a potential jurisdictional issue might lead to a statute of limitations problem; he therefore advised Collins to bring the claim in federal court to preserve the rights of his clients, the heirs of David Warner. T. at 237.

Barker helped prepare the complaint which set forth claims for common law fraud, breach of fiduciary duty and securities fraud in violation of the Securities and Exchange Act of 1934 and Rule 10b-5. T. at 237-39, 241. The basis of this claim was Wallach's purchase of stock from Warner for $11,000. T. at 239. The complaint was filed in federal court in February 1988 but it was not served until sometime in April. T. at 237-42. At this point, Barker testified, "I wanted to just sit there. I didn't have any reason to pursue this at that time because the arbitration was going forward. But counsel for Mr. Wallach, who was Aaron Beyer, wanted to start taking discovery in this case." T. at 242.

## B. Discovery Efforts Prior to the Nachmann Action

### 1. *Proving lack of probable cause: the Nachmann securities act violation claim*

The plaintiffs were thereafter produced for deposition. Barker then served subpoenas "to get access to records that would relate to the allegations in this complaint." T. at 243. He testified that the most important information came from Continental Bank documents in September 1988. T. at 243; D-5. Barker considered the documents relating to the Wallach/ Flynn-Reich securities in the Continental Bank documents extremely significant since "it showed that in 1986, even earlier, in the fall of 1985, that partnership was throwing off substantial amounts of distributions and cash withdrawals to D.H. Wallach, Inc." T. at 246.

When asked about other documents among the Continental Bank documents that he regarded as significant to a securities fraud claim, Barker identified the personal financial statement of the Wallachs dated January 1986 (100055 & 100155) as significant since "it shows he had an investment in a business worth in his view $500,000. I thought it was pretty safe to conclude that was an investment in Warner Group Inc., parent company of Warner Options Inc. (sic)" (should read "Wallach") T. at 247.

For Barker the totality of these Continental Bank documents was significant as well because they showed that Nachmann was out of the "loop" of information flow after he was replaced as accountant of WGI. T. at 248.

Barker subpoenaed Nachmann as a witness for the Warner case and showed him the Continental Bank documents. He characterized Nachmann as "flabber-

gasted" to learn that there was so much profitability in D.H. Options Inc. T. at 249. Barker also interviewed Isadore Burstein who told him that he had not even heard of the Wallach/Flynn-Reich partnership. T. at 250.[16]

Based on these documents, Barker concluded that there were three instances of security fraud. In November 1988, he therefore amended the Warner complaint to assert claims under R.I.C.O. T. at 253. Barker testified that sometime in late October Burstein and Nachmann asked him to include them in Warner's suit against Wallach. T. at 259-60. On November 15, 1988, Barker filed a complaint on behalf of Nachmann and Burstein. T. at 263. The next day he filed a motion to consolidate all the actions but Wallach's attorney filed a motion to remove the Nachmann and Burstein actions to arbitration. Barker estimated that he had spent 120 hours in preparation of these actions. T. at 260-61.

Barker stated that in filing the complaint on Nachmann's behalf he had concluded that Nachmann was "very credible." T. at 261. He denied any recollection that Don Collins, his partner, had warned him to be very careful of Nachmann. T. at 260-61. Prior to Barker's testimony, the jury had been read deposition testimony of Donald Collins, who had served as Nachmann's attorney during the July 1986 shareholders' meeting and had represented Nachmann during his sale of stock to Wallach in December 1986. In the course of the deposition, Collins was asked whether Barker had interviewed him concerning the stock transaction. When

---

16. Plaintiff effectively undermined this point by presenting evidence that Burstein, as secretary of the company, had signed a resolution of Wallach Options that opened negotiations with Flynn-Reich for the joint trading account. T. at 291.

asked what factual matters he had discussed with Barker, Collins responded: "I told him there were certain allegations that I did not know the details about, Mr. Nachmann being in some kind of trouble with some authorities, that he should be very careful about that." T. at 194.

Resolving any conflict in testimony in favor of the verdict winner, the jury was presented with ample credible evidence that contradicted Barker's testimony on its key points. The cross-examination of Barker focused, in large measure, on the Continental Bank documents. In response to Barker's assessment that these documents indicated that Nachmann was out of the "loop," Barker was asked about a memo dated February 1986 from John T. Callaghan, assistant vice president of Continental Bank, stating that the Wallach Options/Flynn-Reich Securities and Wallach Group were having difficulty supplying information to the bank because they were still getting information from Warren Nachmann.[17] T. at 278-79; D-5, no. 100009.

Barker was also confronted with Continental Bank records reflecting on the financial health of the Wallach Group and the Wallach Options subsidiary at the time when Nachmann sold his stocks to Wallach. A memo dated January 27, 1987 from Callaghan, who by then was vice president of Continental Bank, stated that the

---

17. T. at 278-79; D-5, no. 100009. The memo from Callaghan to the Credit Acquisition Department was dated February 12, 1986. The subject was "The Wallach Group":

"On February 10th, I spoke with Mitchell Benson of the above company. I've been awaiting financial information on the Wallach Group and D.H. Wallach Options/Flynn-Reich Securities. Mitchell said that the statements are moving rather slowly since they are still in the process of getting information from Warren Nachmann." D-5.

Wallach Group had an outstanding indebtedness of $200,000. T. at 280; D-5, no. 100009; T. at 280.

The cross-examination then focused on the Wallachs' financial statements which Barker had earlier characterized as a significant factor in his determination that there was a basis for a security fraud claim. See T. at 247. He was confronted with a document from the Continental Bank documents indicating that David Wallach pledged one million in property to secure the indebtedness of the Wallach Group as of January 1986. T. at 281; P-13; D-5, no. 100278. He was then asked about his analysis of Wallach's personal financial statement of January 1986 that he had characterized earlier in his direct testimony as a factor in his determination that there was a viable security fraud claim against Wallach. See T. at 247. In particular, the documents indicated an investment of $1,000,000 in one case and $50,000 in another. T. at 284.[18] When asked what steps he had taken to determine whether the Wallachs might have investments in businesses other than the Wallach Group Inc., Barker stated that he had taken no steps since these documents were not crucial to his decision-making. T. at 284.

Rather Barker stated that the Wallach/Flynn-Reich documents were critical, apparently because they indicated a cash flow to Wallach Options. T. at 285. When asked what steps he had taken to determine the net worth of Wallach Options at the time of this cash flow—

---

18. When asked about the Wallachs' January 1986 financial statements, Barker had indicated that this statement was a significant factor in concluding that there was a viable security fraud claim because "it shows he had an investment in a business worth in his view $500,000. I thought it was pretty safe to conclude that was an investment in Warner Group Inc., parent company of Warner Options Inc." T. at 247.

and before asserting R.I.C.O. claims against Wallach in November 1988—Barker stated that he had spoken to several financial consultants in October and November 1988. He was, however, vague as to the information he had given these experts:

"Q: What information did you have at that time about the liabilities of the Wallach Group Inc.?

"A: Oh, I believe I knew there was a liability of a million dollars at the beginning of the year and paid down by the end of the year. Whether I told Mr. Nagy and Mr. Byrne (financial consultants) that during our first meeting in October, November, I don't remember. It's possible. I don't know.

"Q: Did you tell Mr. Nagy about the $200,000 that they owed in 1987?

"A: *Eventually he found that out. Whether I told him in November 1988 I don't know.*

"Q: In November of 1988 you already had the Continental Bank records that told you that as of a date following Mr. Nachmann's sale of his securities there was at least $200,000 in liabilities in Wallach Group Inc., didn't you?

"A: *Yes, but they had to do a narrow analysis before giving me an evaluation of the value of the stock. It was going to take months to do that.*

"Q: *They didn't do it obviously, before you sued Mr. Wallach in civil R.I.C.O.?*

"A: *No,* that's—they did not give me a dollar value before I filed the suit, that's correct. I don't believe they did." T. at 286. (emphasis added)

This admission that his experts did not complete their financial analysis of the WGI prior to the filing of the Nachmann complaint is particularly significant in light of Barker's subsequent admission that he was not

a financial expert adept at assessing the net worth of companies. This came out in Barker's response to the following questions:

"Q: At the beginning of 1986 Wallach Group Inc. had a negative net worth, isn't that correct?

"A: What's that question again? When?

"Q: The beginning of 1986. I think you testified that you knew they had a million dollars in debt?

"A: In debt?

"Q: In debt.

"A: Yeah.

"Q: So they had a negative net worth?

"A: It depends on how you look at it. I don't know. I'm not an account [sic]. I'm not a financial man. I don't know what the net worth—I knew they had a stream of income, you value times over stream of income. That was a substantial factor in valuing Wallach Group Inc. at any time in its existence." T. at 288.

The cross-examination finally turned to Barker's basis for the allegations set forth in the Nachmann complaint. Paragraph 15 sets forth the following allegations:

"When Wallach purchased Nachmann's shares, Wallach was trading on the basis of inside information which was known to Wallach and unknown to the minority shareholders such as Nachmann, including but not limited to the following:

"(a) WGI, through its subsidiary D.H. Wallach, held the rights to certain options specialist books with a value in excess of $2,000,000, and

"(b) WGI was a 50 percent partner in a partnership known as 'Wallach/Flynn-Reich Securities' which, at the time of the sale was earning more than $1,000,000 per year, and had assets in excess of $20,000,000." Nachmann complaint, ¶15.

Barker acknowledged that he had drafted this language and that he was alleging that Nachmann was an outsider.[19] He was then confronted with a resignation letter by Nachmann dated March 13, 1986. T. at 306; P-16. He was specifically asked whether this conflicted with Nachmann's statements to Barker that he had been fired the year before,[20] thereby framing an issue of credibility for the jury. T. at 306.

When asked whether Nachmann was receiving financial information from the bank in early 1986, Barker stated that he did not know. Excerpts from Nachmann's testimony before the NASD arbitration hearing were then read in which Nachmann indicated that while documents from Industrial Valley Bank referring to monthly statements of D.H. Wallach Options were sent to Nachmann's Cheltenham address, "that doesn't mean I opened them." T. at 307. Barker was also questioned about a letter dated June 10, 1986 from Samuel Dennis, attorney for WGI, requesting that Nachmann return the IVB vault keys as well as books and records of the Wallach FX options.[21]

_____

19. T. at 305. At first, Barker stated that Nachmann was an outsider "in certain respects." He quickly amended this, stating that Nachmann was "an outsider at that point completely." *Id.*

20. In Nachmann's deposition testimony that was read to the jury, Nachmann stated that he had stopped working full-time for D.H. Wallach or any related company in April 1985. T. at 180.

21. T. at 308. The letter dated June 10, 1986 from Samuel Dennis stated:

"Dear Warren:

"I am beginning to understand David's frustration since I have had no response from you with respect to my recent letters and two attempted telephone calls.

"We need the following items and I will be happy to have them picked up at your home or elsewhere if you'll tell me when:

"1. The IVB vault keys

Barker was then questioned about the allegation in paragraph 15 that David Wallach concealed from Warren Nachmann the existence of certain options specialist books with a value in excess of $2,000,000. When asked on what basis Barker had claimed that these specialist books had a value of $2,000,000 in December 1986 when Nachmann sold his stocks to Wallach, Barker stated: "I base that on the fact that there—they were sold a few months later for 2.2 million dollars and on the fact that they were producing a tremendous amount of income." T. at 310. After acknowledging that these assets were sold nearly six months later, Barker responded as follows to cross-examination on this issue:

"Q: Did you inquire of Mr. Collins, did you ask anyone why it was that David Wallach was able to sell those options specialist books in 1987 for such a large amount?

"A: At some point I did. I don't know exactly when it was.

"B [sic]: Did Mr. Collins tell you that there was a change in the rules of the SEC, the national regulatory agency for securities dealers in April of 1987 or May of 1987 that permitted options specialist books to be traded?

"A: Someone told me that eventually. I did learn that eventually.

"Q: Did you think it was—did you make any inquiry before you sued David Wallach making this allegation

"2. The list of the IVB checks that bounced when the IVB accounts were closed. . . .

"3. Books and records of: Stuart Management; Wallach FX options Wallach Securities of N.J. . . .

"7. A list of all investments owned by Wallach Group and affiliates with notation as to the whereabouts thereof." P-8.

into whether there was any change in circumstance between December of 1986 and the sale of those options books that increased or affected their value?

"A: I may have known that rule change before I filed the complaint, I might not have, but it didn't make a lot of difference because specialist books had intrinsic value, regardless of whether you could sell them or not they had intrinsic value as a money producer.

"Q: Did you ask Mr. Collins, who was indeed counsel to the Philadelphia Stock Exchange during this time, was he not?

"A: At that point I believe that he was.

"Q: Did you ask Mr. Collins whether as of December 1986, these options specialist books could have been sold for anything?

"A: Did I ask Mr. Collins that question? I learned at some point from some source that there was a rule that was changed in May of 1987 or April of 1987. When I learned that I'm not sure but I did learn that.

"Q: Did you make any inquiry before you sued David Wallach?

"A: I don't remember whether I asked that question or found out about that before or after I sued him. I don't know." T. at 311-12.

In this way, plaintiff presented an evidentiary foundation that exposed the weakness of the defendant law firm's suit against Wallach based in large measure on the very Continental Bank documents that Barker claimed had been so significant in his decision to file the Nachmann action. By thereby creating this evidentiary basis for the jury's conclusion that the securities act violation claim against Wallach had been brought without "a reasonable belief in the existence of facts upon which the claim was based" plaintiff was primed

to challenge the defendant's "reasonableness" and "purpose" in asserting a R.I.C.O. claim against Wallach. He established this point through the testimony of his expert, Professor Edward Rock. When asked whether the defendant law firm had probable cause to bring a R.I.C.O. claim against Wallach, Professor Rock replied: "my opinion was that there was no probable cause." T. at 207. He offered the following explanation:

"In order to state a claim under the civil R.I.C.O. statute it's essential that you show that there is a pattern of racketeering activity. In order to show that there's a pattern of racketeering activity you have to show a pattern of underlying acts. One of—under the federal R.I.C.O. claim, case, statute, one of the acts that you can show, if you can show a pattern of them to establish a violation, is securities fraud. That is the only underlying act, the only predicate act, as they say in the statute, the only predicate act that was alleged in the complaint against Mr. Wallach.

"Q: And in the context of the R.I.C.O. statute are they talking criminal securities fraud?

"A: The—under R.I.C.O., if you can establish a pattern of violations of 10b-5, that would constitute a pattern of racketeering activity.

"Q: Okay. And did you see a pattern of racketeering activity in this case?

"A: Well, since the only underlying act that was alleged was a violation of 10b-5 and since as I described a moment ago there was no probable cause for establishing a violation of 10b-5, once the 10b-5 claim was without probable cause, then necessarily the R.I.C.O. claim is without probable cause because there is no probable cause for the underlying predicate acts." T. at 208.

## 4. *Establishing improper purpose: the Nachmann R.I.C.O. claim*

To determine whether Wallach had presented sufficient evidence to establish his wrongful use of process claim against the defendant law firm, the jury necessarily had to focus on the particular time span and the factors that led Barker to file the R.I.C.O. action against Wallach in November 1988. The court—and the parties—were sensitive to limiting the presentation of evidence to those facts that were available to Barker. See T. at 231, 232, 256. A first step was to focus on the legal requirements for establishing a R.I.C.O. claim in 1988—when the complaint against Wallach was filed.

The Nachmann complaint alleged that Wallach had violated the R.I.C.O. Act, 18 U.S.C. §1961 et seq.[22] In *Sedima v. Imrex Inc.,* 473 U.S. 479, 496 (1985), the United States Supreme Court outlined the criteria for establishing a R.I.C.O. claim under 18 U.S.C. §1962. To establish a claim for violation of R.I.C.O., "a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 496. The statute defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within 10 years (excluding imprisonment after the commission of a prior act of racketeering activity." 18 U.S.C. §1961(5) (1988).

The Supreme Court in *Sedima* elaborated on this definition of "pattern of racketeering" in its famous footnote 14 which was frequently cited by courts in the Third Circuit. See *e.g., Barticheck v. Fidelity Union Bank,* 832 F.2d 36, 38 (3d Cir. 1987); *Marshall-Silver*

---

22. Nachmann complaint, ¶5.

*Construction Co. v. Mark Mendel,* 835 F.2d 63, 65 (3d Cir. 1987), *vacated and remanded,* 492 U.S. 913 (July 3, 1989). In *Sedima,* the U.S. Supreme Court stated that to establish a pattern of racketeering "while two acts are necessary, they may not be sufficient." *Sedima, supra,* 473 U.S. at 496 n.14. It suggested, as well, that some duration was necessary: "The infiltration of legitimate business normally requires more than one 'racketeering' activity and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to create a pattern. . . . So, therefore, proof of two acts of racketeering, without more, does not establish a pattern." *Id.* (quoting 116 Cong. Rec. 18940 (1970) (Sen. McClellan).

In the Third Circuit, *Marshall-Silver Construction Co. Inc. v. Mendel, supra* was still good law when the Nachmann complaint was filed in November 1988 though it was vacated in July 1989. The *Marshall-Silver Construction Co.* case adopted the test set forth in *Barticheck v. Fidelity Union Bank, supra,* that to determine whether a "pattern of racketeering was successfully alleged it was necessary to consider the number of unlawful acts, the length of time over which the acts were committed. . . ." *Marshall-Silver, supra,* 835 F.2d at 67.

Viewing the evidence in a light most favorable to the verdict winner, plaintiff introduced ample evidence that Barker had initiated the Nachmann R.I.C.O. claim without probable cause and for the purpose of transforming the Warner securities act violation action into a behemoth R.I.C.O. case with its harassing threat of treble damages. T. at 222, 424, 432, 437. Plaintiff developed this point in the cross-examination of Barker by emphasizing the crucial nature of the Nachmann transaction for establishing the requisite "continuity" of racketeering activity necessary for a R.I.C.O.: while

the Burstein and Warner stock sales both occurred in February 1986, it was the Nachmann stock sale, in December 1986, that provided the requisite "period of time" for a R.I.C.O. action. T. at 208-209, 271.

In the initial stages of this cross-examination, Barker denied that he needed the Nachmann action to establish a R.I.C.O. claim, since the R.I.C.O. statute required two acts over a period of 10 years. T. at 271. Despite persistent questioning, he refused to identify the specific legal precedent that he had relied upon in 1988 to determine the prerequisites for a viable R.I.C.O. claim; he did, however, make a vague reference to precedent of the U.S. Supreme Court. T. at 274. Finally, when pushed into providing the name of any case that would have supported a valid R.I.C.O. claim based on just two predicate acts in the same month,[23] Barker made the following response—a response that reasonably could be interpreted as an unintended admission that Barker had, in fact, considered the circumstances surrounding the Nachmann stock transaction essential for asserting a R.I.C.O. claim against Wallach:

"Q: Did you have, in 1988, any authority for the proposition that in the Third Circuit, which is the circuit we practice law in and that governs the federal courts here in Philadelphia, it would have been sufficient to allege a civil R.I.C.O. pattern of racketeering if the most you could allege was two victims, within a one month period?

"A: *I don't know because I wasn't looking at that. I was looking at whether three predicate acts in one year constituted a pattern of racketeering activity* and

---

23. Defendant's own expert, Professor Coffee, acknowledged that to establish a R.I.C.O. claim in 1988 "the pattern of racketeering must continue over a period of some time." T. at 416.

the law as stated by the Supreme Court of the U.S. at that time was in my view supportive of the theory that three predicate acts in one year was sufficient to state a cause of action for R.I.C.O." T. at 277. (emphasis added)

This statement by Barker—as well as his demeanor and responses to the preceding questions—raise issues of credibility concerning his motive in bringing the Nachmann action, especially if, as plaintiff demonstrated throughout his case, defendant lacked a reasonable belief in the facts underlying the alleged security act violations vis-a-vis the Nachmann stock transaction. Barker's statement is particularly relevant in the context of testimony by Collins, Barker's partner in the law firm, that he had cautioned Barker "to be very careful" about Nachmann. T. at 194.

These issues of motive and credibility were properly submitted to the jury for resolution. The Restatement (Second) of Torts §681B(2)(b) (1976 & 1980 App.), provides that in an action for wrongful civil proceedings "the jury determines whether the defendant acted primarily for a purpose other than that of securing the proper adjudication of the claim on which the proceeding was based." An outright "confession" is not required for proof of an improper purpose. *Ludmer v. Nernberg, supra* at 325, 640 A.2d at 943.

Indeed, the plaintiff argues that in a wrongful use of process case improper purpose can be inferred from lack of justification. This position is supported by the Superior Court in *Gentzler v. Atlee, supra*. The *Gentzler* court stated: "We have previously held that the plaintiff in a wrongful use of civil proceedings action need not obtain the defendant's outright 'confession' of improper purpose; an improper purpose may be inferred where the action is filed without justification." *Id.* at 142,

660 A.2d at 1385.[24] In addition, the *Gentzler* court observed that the plaintiff "alleged facts of improper purpose, namely to harass or maliciously injure Gentzler and unnecessarily to delay and increase the cost of litigation." *Id.* The court, therefore seems to set up two methods for establishing improper purpose: (1) inference from lack of justification or (2) proof of allegation of harassment or malicious injury.

There is another strand of precedent that supports the *Gentzler* position that "an improper purpose can be inferred from lack of justification." Malicious use of prosecution cases, involving an underlying criminal action, typically conclude that "malice" can be inferred from lack of probable cause. These cases seem particularly relevant to the Wallach case given the unique characteristics of the R.I.C.O. action that was brought against him.

In cases involving alleged malicious use of process in an initial criminal prosecution, Pennsylvania courts have repeatedly held that "malice" can be inferred from lack of probable cause. See *Wainauskis v. Howard Johnson Co., supra* at 279, 488 A.2d at 1123 (in action for malicious prosecution "malice may be inferred from [lack] of probable cause"); *Wright v. Schreffler,* 421 Pa. Super. 428, 433, 618 A.2d 412, 415 (1993). In *Wainauskis,* a former employee brought a malicious use of process claim against her former employer for filing a criminal complaint against her asserting theft of the company's cash receipts. After she was acquitted in a second trial, she brought a malicious use of process

---

24. Defendant attempts to diminish the significance of this statement by taking it out of context and citing it in juxtaposition to different portions of the *Genztler* opinion. It is imperative, however, to analyze this critical language within its specific context.

suit against her former employer. The jury concluded that the employer had lacked probable cause; the court concluded that "malice could be inferred from [lack] of probable cause." *Wainauskis, supra* at 279, 488 A.2d at 1123.

Likewise, in *Wright v. Schreffler, supra,* a college student who was arrested for possession of marijuana by the defendant university employee brought a malicious use of process claim against the defendant. After concluding that the plaintiff had established that the defendant lacked probable cause, the Superior Court held that "malice may be inferred from want of probable cause." *Wright, supra* at 433, 618 A.2d at 415.

The strong analogies between a civil and criminal R.I.C.O. action have been recognized by the United States Supreme Court[25] as well as by numerous commentators.[26] Given this peculiar heritage of civil R.I.C.O.,

---

25. See *e.g., H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 248 (1989) ("Congress, for cogent reasons, chose to enact a more general statute (*i.e.* R.I.C.O.), one which although it had organized crime as its focus, was not limited in application to organized crime"). As the *H.J. Inc.* court observed, R.I.C.O. provides for drastic remedies: "Conviction for a violation of R.I.C.O. carries severe criminal penalties and forfeiture of illegal proceeds while a person who is found in a private civil action to have violated R.I.C.O. is liable for treble damages, costs and attorney fees." *Id.* at 232. In *Sedima,* the Supreme Court suggested the links between the criminal and civil elements of a R.I.C.O. claim when it observed that "the predicate acts involve conduct that is 'chargeable' or 'indictable,' and offenses that are 'punishable' under various criminal statutes." *Id.,* 473 U.S. at 488. See also, 18 U.S.C. §1961.

26. See *e.g.,* Anne B. Poulin, "R.I.C.O.: Something for Everyone," 35 Villanova L.Rev. 853, 857 ("To an unusual extent, the statutory provisions governing civil claims (*i.e.* of R.I.C.O.) track the criminal provisions. In the civil arena, however, unlike the criminal, there is no restraining influence to avoid abuses").

Pennsylvania malicious prosecution precedent is relevant by analogy. Thus, under this precedent malice or improper motive could be inferred from lack of probable cause.

Evidence was presented, however, that would also support the second prong of *Gentzler* by establishing an improper motive to harass and humiliate. Plaintiff has consistently argued that "the addition of the civil R.I.C.O. claim permitted the firm to make the case three times as big as it had been and to claim attorney's fees as well." Brief of plaintiff at 9. Arguably, using the meritless Nachmann claim to convert the Warner action into a behemoth R.I.C.O. claim is an improper purpose. Wallach, through his own testimony and that of his friend and attorney Sam Dennis, presented evidence of how harassing this R.I.C.O. claim was and the heavy emotional toll it exacted. T. at 85-86, 154.

Like the plaintiff in *Gentzler,* Wallach had alleged in his complaint for the wrongful use of civil process action that the Nachmann action was motivated by a purpose of extorting a favorable settlement from Wallach by threats of treble damages, punitive damages and attorney fees.[27] Similarly, Wallach has maintained repeatedly throughout his litigation that the filing of the Nachmann R.I.C.O. claim was intended to humiliate and harass him. In closing argument, Wallach reiterated this point by explaining that "the reason this case was fought so bitterly, we've heard David Wallach say, was that he was hurt to the core and very angry at being charged as a racketeer. A racketeer carries with it, as you have heard, connotations of being involved in the Mafia. And the person in a lawsuit that turned this

---

27. *Wallach v. Stradley Ronan,* complaint ¶15.

into a racketeering case is the Nachmann case." T. at 437.

The "in terrorem" effect of a R.I.C.O. action and its proclivity for inducing a defendant to settle has been noted by many commentators.[28] There is Pennsylvania precedent that using a meritless claim to harass or force a settlement is an improper purpose. The Pennsylvania Superior Court held, for instance, that the filing of a baseless action in a caveat to file the probate of a will for the purpose of extracting an unwarranted settlement was an improper purpose. See *e.g., Shaffer v. Stewart,* 326 Pa. Super. 135, 473 A.2d 1017 (1984). In reaching this conclusion, the *Shaffer* court relied, inter alia, on Restatement (Second) of Torts §676 which focuses on the "propriety of purpose" in a wrongful civil proceedings action. Comment c sets forth as an example of an improper purpose a situation "when the proceedings are initiated for the purpose of forcing a settlement that has no relation to the merits of the claim." *Shaffer v. Stewart, supra* at 142, 473 A.2d at 1021. It elaborates that "a further instance occurs when the proceedings are based upon alleged facts so discreditable as to induce the defendant to pay a sum of money to avoid the notoriety of trial." Restatement (Second) of Torts §676 comment c (1976). Clearly, the allegations of "rack-

28. See *e.g.,* Brown & Lieberman, "R.I.C.O. Basics: A Primer," 35 Villanova L.Rev. 865, 881 (1990) (one "benefit" of asserting a R.I.C.O. claim—at least for the plaintiff—is an "enhanced settlement leverage."); A. Matthews, "Shifting the Burden of Losses in the Securities Markets: The Role of Civil R.I.C.O. in Securities Litigation," 65 Notre Dame L.Rev. 896, 936 (1990) (the "in terrorem" effect of potential treble damages under civil R.I.C.O. might induce a defendant to settle a securities violation at one hundred cents on the dollar).

eteering" in the Nachmann complaint can be characterized as "discreditable."

### III. *Motion for a New Trial*

Defendant also seeks a new trial on two grounds: (1) the verdict was against the weight of the evidence; and (2) the improper admission of certain evidence.

The standards for granting a new trial have been frequently outlined. A new trial should be granted on the grounds that the verdict is against the weight of the evidence only when the "jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Butler v. Flo Ron Vending Co.,* 383 Pa. Super. 633, 645, 557 A.2d 730, 736 (1989), *appeal denied,* 523 Pa. 646, 567 A.2d 650 (1989). A new trial should not be granted merely because of conflicting facts or because the trial judge might have reached a different conclusion. A new trial also should ordinarily not be granted where the evidence is conflicting and the jury might have found for either party. *Burrell v. Philadelphia Electric Co.,* 438 Pa. 286, 289, 265 A.2d 516, 518 (1970). Another ground for granting a new trial is that the jury verdict may have been based on improperly admitted evidence. *Whyte v. Robinson,* 421 Pa. Super. 33, 38, 617 A.2d 380, 382 (1992).

### A. The Verdict Was Not Against the Weight of the Evidence

Defendant argues that there "was nothing in the record to support the jury's findings that Stradley acted without probable cause and for a primary purpose other than securing a proper adjudication of Nachmann's claims." Defendant's brief at 32. Defendant offers little specific support for this conclusory statement except for its gen-

eral argument that "Wallach had failed to disclose material information to Nachmann when he purchased Nachmann's WGI stock in December 1986." *Id.* at 33.

Plaintiff, in contrast, throughout the trial presented varied evidence that the defendant law firm lacked a reasonable belief in the facts of the Nachmann claim against Wallach. Plaintiff demonstrated, for instance, that the law firm failed to analyze the net worth of the WGI and the Wallach Options subsidiary prior to filing the R.I.C.O. action. T. at 285-87. Plaintiff demonstrated that at the time of this stock transaction, WGI had an outstanding debt of $200,000 to Continental Bank. T. at 280. Plaintiff demonstrated that the defendant law firm had failed to consider the effect of an SEC Rule change which rendered the WGI stock option books a valuable commodity in mid-1987—nearly six months after the Nachmann stock sale. T. at 311-312. All of these factors were essential to determining "materiality" of the information the WGI may—or may not—have disclosed to Nachmann at the time of the December 1986 stock sale.

Plaintiff also presented evidence that chipped away inexorably at the credibility of Nachmann—and Burstein. While the defendant, at various points in its brief, suggests that it had no obligation under the Dragonetti Act to investigate clients, for much of the period at issue between September and October 1988, Nachmann and Burstein were potential witnesses, not clients. T. at 259-60. Hence, the law firm's uncritical reliance, for instance, on Burstein's statement that he knew nothing about Wallach/Flynn-Reich's joint venture lacks credibility in the face of plaintiff's evidence that as secretary of the company, Burstein had signed the Wallach resolution authorizing negotiations on the formation of this venture. *Compare* T. at 250 *with* T. at 291.

Plaintiff repeatedly challenged Nachmann's credibility concerning the extent and duration of his involvement with the financial affairs of WGI. For instance, though Nachmann stated that he had been fired in April 1985, plaintiff produced a letter of resignation dated March 1986. *Compare* T. at 180-81 *with* T. at 61. Plaintiff also presented evidence from defendant's own Continental Bank documents that suggested that Nachmann was perceived as having access to relevant financial information at least until early 1986. T. at 278-79; D-5, no. 100009. Moreover, in conversations with Collins around the time of the July 1986 shareholders' meeting, Nachmann had expressed his sense that the company had considerable assets. T. at 188. Finally, Don Collins, a member of the defendant law firm with firsthand knowledge of Nachmann and his stock transaction stated that when Barker was researching the case, Collins had warned him to be "very careful" about Nachmann. T. at 194.

Plaintiff presented evidence of the ways in which the R.I.C.O. claim harassed and humiliated David Wallach—at a point in his career when he had assumed a new position. Through the testimony of Wallach—as well as of his friend and lawyer Sam Dennis—the plaintiff documented the effect of a groundless civil R.I.C.O. claim—with its charges of racketeering and the threat of treble damages. For these reasons, the verdict in favor of plaintiff was not against the weight of the evidence.

### B. Admission of Evidence: the Collins Testimony and the Dennis Letter

The defendant argues that a new trial should be granted under the recognized principle that a new trial may be granted where "the jury verdict *may have been*

based on improperly admitted evidence." *Whyte v. Robinson, supra* at 38, 617 A.2d at 382. (emphasis in original) Guidelines for determining whether evidence has been improperly admitted were set forth in *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa. Super. 14, 22, 473 A.2d 584, 588 (1984):

"A trial court may properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. . . . However, *'prejudice' for the purposes of this rule, does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis. . . . In Pennsylvania, the trial judge has broad discretion regarding the admission of potentially misleading and confusing evidence."* (emphasis added)

### 1. *Deposition testimony of Donald Collins*

Donald Collins, a member of the defendant law firm, was the attorney who originally asked Barker for assistance in preparing the Warner action against Wallach. T. at 230. He was also knowledgeable about Warren Nachmann's involvement with WGI since he had attended the July 1986 shareholders' meeting of WGI as Nachmann's attorney. T. at 182, 188-89. Moreover, Collins was Nachmann's attorney and adviser throughout the negotiations for Nachmann's sale of stock to Wallach in December 1986. T. at 184-87, 191-94. In the course of a deposition, Collins was asked whether Barker had ever interviewed him "to learn what you had found out about Mr. Wallach and the transactions?"

"A: Sure, yes, yes.

"Q: Was there anything else that was a factual matter that you discussed with Mr. Barker in the context of this consultation?

"A: I told him that there were certain allegations that I did know the details about Mr. Nachmann being in some kind of trouble with some authorities, that he should be very careful about that." T. at 194.

Defendant argues that this testimony should not have been admitted at trial "because it did not meet the threshold of relevancy." Defendant's brief at 35.

This testimony, in contrast, clearly crosses this threshold since it provides invaluable insight of the many factors Barker encountered in his preparation for the Nachmann action.[29] In determining whether evidence is admissible, a fundamental consideration is "whether the proffered evidence is relevant to the fact sought to be proved. Evidence is relevant if it tends to make a fact at issue more or less probable." *Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983).

A central task facing the jury in this case was determining whether the defendant law firm "reasonably" believed in the "existence of the facts upon which the claim was based." 42 Pa. C.S. §8352. Donald Collins—in his unique position as adviser to Nachmann and Barker—could offer extremely relevant information about the facts of the transactions at issue. His warning to Barker about Nachmann's credibility was a factor which the jury could rightly weigh in determining whether the Nachmann R.I.C.O. claim that Barker ultimately filed against Wallach was based on a "reasonable belief in the existence of facts" supporting the claim. While defendant is understandably concerned about the negative references to Nachmann by a member of the defendant law firm, the probative value of Collins'

---

29. When asked about the warnings by Collins, Barker stated that he had no recollection of them, thereby raising an issue of credibility for the jury. T. at 260.

testimony outweighs any prejudicial effect. As mentioned previously, prejudice "does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis." *Daset Mining Corp., supra* at 22, 473 A.2d at 588. Given Collins' familiarity with the personalities and facts involved in the various stock transactions as well as his status as a partner of the defendant law firm, his advice as to Warren Nachmann was certainly a relevant consideration for an attorney assessing the merits of Nachmann's claim against Wallach.

Defendant next argues that Barker "as a matter of law" was "entitled to rely on Nachmann's statements to him." Defendant's brief at 36. In so arguing, defendant relies on *Meiksin v. Howard Hanna Co. Inc.,* 404 Pa. Super. 417, 424, 590 A.2d 1303, 1306 (1991), *appeal denied,* 528 Pa. 644, 600 A.2d 196 (1991), which provides that lawyers can safely rely on facts stated by their clients. The operative word here, however, is "clients." This precedent is not applicable here because throughout much of the period prior to the filing of the Nachmann action, Nachmann—by Barker's own testimony—was a "witness" (for the Warner case) and not a client in his own right. T. at 259. As Barker testified:

"What happened was in the summer and fall of 1988 I was discussing the Warner case *with witnesses. Two important witnesses were Mr. Nachmann and Mr. Burstein* because they were shareholders. And *in late October, early November* Mr. Burstein asked me if he was included in the suit. And I said no, you're not this is David Warner's suit. . . .

"And then he said, well Mr. Nachmann called me and he said, I want to be included too." T. at 259-60. (emphasis added)

Since Nachmann was not a client throughout most of the period prior to Barker's filing the Nachmann complaint in mid-November 1988, Barker was not absolved from raising reasonable questions concerning the merits of any potential R.I.C.O. claim on his behalf.

## 2. *Admissibility of the June 1986 Sam Dennis letter.*

Defendant argues that the court erred in admitting a letter dated June 10, 1986 by Sam Dennis, Wallach's attorney to Warren Nachmann requesting that he return various documents of the Wallach companies as well as an IVB vault key.[30]

The court repeatedly cautioned the jury that this letter did not mean that Nachmann had the documents but merely that Wallach through his attorney requested them. T. at 141, 143, 464. Defendant is obviously correct that this letter cannot be used to prove that Nachmann actually possessed the WGI documents sought in June 1986. But, as plaintiff argues, this letter does provide evidence as to *Wallach's* perceptions concerning Nachmann's access to financial information and his role as an "insider" to WGI; it is thus a factor the jury could consider when evaluating the July 1986 shareholders' meeting. Plaintiff's brief at 11.

Defendant's concern about the prejudicial effect of this letter, however, seems overstated since it had itself submitted to the jury—tucked away in its Continental Bank records—a memo bearing a striking resemblance to the Dennis letter. See D-5, no. 100009. A memo to the Credit Acquisition Department dated February 12, 1986 from John T. Callaghan Jr., assistant vice

---

30. See P-8; T. at 139. For the text of this letter, see footnote 21 *supra* at p. 257-58.

president of Continental Bank, likewise suggested that the Wallach Group principals believed in February 1986 that Nachmann still had access to its financial information:

"On February 10, I spoke with Mitchell Benson of the above company (*i.e.,* The Wallach Group). *I've been awaiting financial information on the Wallach Group and D.H. Wallach Options/Flynn-Reich Securities. Mitchell said that the statements are moving rather slowly since they are still in the process of getting information from Warren Nachmann."* D-5, no. 100009. (emphasis added)

Since the defendant itself presented this information to the jury—albeit for February rather than June 1986— their arguments concerning the Dennis letter must be considered in this context.

## C. Jury Charge on Improper Motive

Defendant argues that the court erred in charging the jury that "it could infer an improper purpose from a finding that Stradley acted without probable cause." Defendant's motion for post-trial relief, ¶C(5). It also argues that the charge was confusing. *Id.* ¶C(6).

In instructing the jury on the elements of the wrongful use of process claim the court adhered to the relevant statutory language and precedent from the Pennsylvania Superior Court. To appreciate its effect, it must be analyzed in its totality. The court outlined the elements set forth in the statute at 42 Pa. C.S. §8351 as follows:

"A person who takes part in the initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings if, A, he acts in a grossly negligent way, B,

or without probable cause and primarily for a purpose other than securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based and, C, the proceedings have terminated in favor of the person against whom they were brought." T. at 455.

The court then instructed the jury as to the element of "gross negligence" as it relates to the wrongful use of civil process statute. 42 Pa. C.S. §8351(a)(1); T. at 455. Next it tracked the language in section 8352 which defines probable cause for the purpose of establishing a wrongful use of process claim. The court told the jury that they must find that the defendant acted with probable cause "if you find that the defendant reasonably believed in the existence of facts upon which the claim was based." T. at 456.

The court, paraphrasing 42 Pa. C.S. §8351(a)(1), told the jury that if an attorney initiates a proceeding without probable cause he is still not liable under the wrongful use of process claim "if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim." T. at 456-57.

Finally, the court instructed the jury:

"In connection with the requirement that the plaintiff prove that the primary purpose for which the defendants brought the proceeding was not that of securing the proper adjudication of the claim, I instruct you that the [sic] under the law you may infer an improper purpose if you find by the preponderance of the evidence that the defendants filed the action against the plaintiff in this case without justification." T. at 457.

This last instruction essentially quoted *Gentzler v. Atlee, supra.* As the Superior Court in *Gentzler* stated:

"We have previously held that the plaintiff in a wrongful use of civil proceedings action need not obtain the defendant's outright 'confession' of improper purpose; *an improper purpose may be inferred where the action is filed without justification." Gentzler, supra* at 142, 660 A.2d at 1385.

## IV. *Punitive Damages*

The wrongful use of civil proceedings statute specifically provides for the award of "punitive damages according to the law in appropriate cases." 42 Pa. C.S. §8353(6). The issue of punitive damages was submitted to the jury separately, only after they had already returned a verdict in favor of the plaintiff on issues of liability and compensatory damages. In response to the jury interrogatory, the jury indicated that (1) the defendant "acted without probable cause in bringing the Nachmann suit against plaintiff" and (2) that "the defendant, in bringing the Nachmann suit against plaintiff acted for a primary purpose other than securing a proper adjudication of Nachmann's claims." [31] The jury did not find that the defendant had acted in a grossly negligent manner nor did they award damages for medical expenses. They did conclude, however, that the plaintiff had suffered emotional distress as a result of the Nachmann suit. [32]

Defendant argues that since the jury did not find the law firm grossly negligent, it was improper to submit

31. *Wallach v. Stradley, Ronan,* Phila. C.C.P. no. 9110-3776, Jury Interrogatory, ¶¶1 & 3.

32. *Id.* ¶¶2, 6, 8.

the issue of punitive damages to the jury. Defendant's brief at 31.

The law is to the contrary on this point: if the jury had found the defendant grossly negligent, then an award of punitive damages would not have been sustainable. See *Takes v. Metropolitan Edison Co.,* 440 Pa. Super. 101, 655 A.2d 138 (1995). In *Takes,* the court explained that "[o]ur high court has specifically held that punitive damages may not be awarded for negligent, or even grossly negligent conduct." *Takes, supra* at 121, 655 A.2d at 148. Hence, the jury's conclusion in the instant case that the defendant law firm was not grossly negligent did not preclude submitting the issue of punitive damages to the jury.

The Pennsylvania Supreme Court has adopted the rule of punitive damages outlined in section 908 of the Restatement (Second) of Torts. *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984); *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 169-70, 494 A.2d 1088, 1096 (1985). This section provides:

"PUNITIVE DAMAGES

"(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

"(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Restatement (Second) of Torts §908 (1977).

Consequently, because the purpose of these damages is punishment and deterrence, punitive damages are

awarded only for conduct which involves some element of outrage. The defendant's acts must be done either with an evil motive or "with a reckless indifference to the rights of others." *Moran v. G.&W.H. Corson Inc.,* 402 Pa. Super. 101, 113, 586 A.2d 416, 422-23 (1990). The Pennsylvania Supreme Court has stated that "[t]he determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused." *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 495, 587 A.2d 702, 705 (1991).

The jury in this case concluded that the defendant law firm had brought the R.I.C.O. action against David Wallach without probable cause and with an improper purpose. Since the jury also concluded that the defendant had not been grossly negligent, it might be surmised that they found intentional conduct or outrageous and reckless indifference. In any event, bringing a meritless R.I.C.O. action against a defendant, thereby subjecting him to the threat of treble damages and the humiliation of being labeled a "racketeer" can certainly support a finding of outrageous conduct. Plaintiff through his own testimony outlined the heavy emotional toll these accusations exerted on him. T. at 85-87, 92.

In arguing against the imposition of punitive damages, defendant once again rehashes the argument that there was probable cause for the Wallach action. This obscures the central issue at this point which is if a jury concludes that the defendant brought a meritless R.I.C.O. action against Wallach, under what circumstances should punitive damages be awarded?

There is evidence that in initiating this action, the defendant displayed a reckless disregard for the rights of David Wallach. At one point in his testimony, for instance, Barker stated that the personal financial statements of the Wallachs had been a substantial factor in his decision to bring a securities act violation; on further questioning as to how closely he had analyzed these documents, Barker recanted and said that, in fact, they had not been a significant factor. *Compare* T. at 247 *with* T. at 283-84. In a conference with the court and opposing counsel, counsel for the plaintiff succinctly outlined the "outrageous" elements of Nachmann's actions toward Wallach:

"I also suggest, your honor, that it was outrageous, and I urge this on the court, that it was outrageous to pick Mr.—to use Mr. Nachmann to turn this case into a civil R.I.C.O. case with treble damages. Without Mr. Nachmann they had no civil R.I.C.O. because, as Professor Rock testified, you need a course of conduct over a period of time. Until they had Nachmann, whose credibility they had reason to question, they did not have any—they did not have predicate acts over a period of time. Both of the other purchases of stock took place in one month in 1986. So what they did was they took a person of questionable credibility and added him to the case and turned the entire thing into a civil R.I.C.O., turning the Warner case into a civil R.I.C.O. treble damages, turning the Nachmann and Burstein cases into R.I.C.O. treble damages, all on the case of Warren Nachmann whose credibility was in question and who was the chief financial officer of the company he said he didn't get all the information, financial information, from." T. at 222.

It is important to note that the jury awarded punitive damages after considering additional testimony of Barker. In this testimony, he responded—somewhat grudgingly—to questions about the size of the firm as well as the salaries of associates and partners. This line of questioning was in accordance with section 908 of the Restatement (Second) of Torts which provides:

"In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." Restatement (Second) of Torts §908 (1977).

Barker was also asked whether the defendant law firm had any internal mechanism or committee to assure that wrongful use of process claims were not brought against members of the general public. He was, at first, evasive, while volunteering "I don't think we ever file lawsuits against attorneys. I think that has to be an extremely unusual circumstance." T. at 484. Ultimately, he concluded:

"I would say that the lawyer, depending on the case, a lawyer is expected to use his independent judgment to decide whether to bring a case although there are very few associates who would bring a case unless they first confer with a partner who is much more experienced before he actually files suit." T. at 484.

This failure of the defendant law firm to provide a cohesive internal procedure for reviewing claims to make sure they are meritorious was necessarily an element "of the character of the defendant's act" which, under section 908 of the Restatement, is a proper element for the jury to consider in assessing punitive damages.

## V. *Conclusion*

The Nachmann R.I.C.O. claim against Wallach did not take place in an historical vacuum. Throughout the 1980s there was a proliferation of civil R.I.C.O. cases.[33] Among those concerned by this trend was Justice Powell who wrote, in dissent, "Typically these suits are being brought—in the unfettered discretion of private litigants—in federal court against legitimate businesses seeking treble damages in ordinary fraud and contract cases. *There is nothing comparable in those cases to the restraint on the institution of criminal suits exercised by government prosecutorial discretion.*"[34] One restraint available to private citizens against abuse of civil process in Pennsylvania is the Wrongful Use of Civil Process statute. It is, of course, less than ideal since it takes an unusually tenacious—and patient—plaintiff to await his day in court. Ultimately, however, David Wallach succeeded in persuading a jury with his evidence that the Nachmann R.I.C.O. claim had been brought against him without probable cause and with an improper purpose.

---

33. See *e.g., Sedima, supra,* 473 U.S. at 481 n.1 (1985): "Of 270 District Court R.I.C.O. decisions prior to this year, only 3 percent (nine cases) were decided throughout the 1970's, 2 percent were decided in 1980, 7 percent in 1981, 13 percent in 1982, 33 percent in 1983 and 43 percent in 1984 (citing Report of the Ad Hoc Civil R.I.C.O. Task Force of the ABA section of Corporation, Banking and Business Law 55 (1985).

34. *Sedima, supra, 473 U.S. at 529-30, Powell, J., dissenting.*

Consequently, for the reasons set forth above, defendant's motions for post-trial relief are denied.

## ORDER

And now, April 29, 1996, upon consideration of the motion for post-trial relief of defendant Stradley, Ronan, Stevens & Young, the response thereto of plaintiff David Wallach, and the trial record, it is hereby ordered and decreed that defendant's motion is denied for reasons set forth in a contemporaneously filed memorandum opinion.

